LUKA v. LOWRIE.

1. Physicians and Surgeons — Malpractice — Negligence — Emergency.

Where plaintiff's foot was badly injured, and four physicians who examined it concluded that it was necessary to amputate the foot, and sent for defendant, who examined the patient and decided that it must be amputated, plaintiff, a minor, being unconscious and having no friends or relatives accessible, the case was such that defendant was justified in treating it as an emergency case.

2. Same.

In such an instance, error of judgment is not negligence, if defendant used faithfully his experience, judgment, and facts

and knowledge which could be ascertained in the exercise of ordinary skill.[1]

3. SAME—EVIDENCE.

That a physician testified, from an examination of the amputated foot, preserved in alcohol, that it might have been saved, raised no issue for the jury on the question of negligence.

4. SAME—CONSENT OF PARENTS.

In the absence of testimony that the parents of plaintiff would have refused their consent to the operation if they had been present, or that defendant was negligent in failing to procure it, a verdict was rightly directed in favor of defendant.

Error to Wayne; Mandell, J. Submitted April 5, 1912. (Docket No. 53.) Decided July 11, 1912.

Case by Charles Luka, an infant, by his next friend, against George B. Lowrie and others for malpractice. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*William C. Gottman* and *Jonas B. Houck*, for appellant.

*Merriam, Yerkes & Simons*, for appellees.

The plaintiff, a boy 15 years of age, while crossing the Michigan Central Railroad track, was knocked down by an engine and in some manner, not clearly shown, was thrown under the wheels of a car. His left foot was mangled and crushed. There was a compound disarticulation of the bones of the foot, and one of the principal bones of the arch, the "scaphoid" bone, was torn away entirely, the flesh was crushed and torn from the top of the foot, leaving the muscles, ligaments, and bones exposed. The plaintiff testified:

"I could see the bones sticking out. I could see they

[1] Degree of care and skill required of physician or surgeon, see note in 37 L. R. A. 830.

Liability of physician for performing surgical operation on minor without parents' consent, see note in 7 L. R. A. (N. S.) 612.

weren't broken.   Don't know how many bones were sticking out; around four or five, something like that."

Shortly after his injury, plaintiff was removed to Harper Hospital in an ambulance.   He was partially conscious upon his arrival and was able to communicate his name and the name of the street upon which he lived to the attending surgeons.   Within 10 or 15 minutes after his arrival, he lapsed into a comatose condition, and later into complete unconsciousness.   Efforts to revive him by injections of strychnine and infusion of a saline solution were made, but he remained unconscious until after the operation.   Soon after his arrival at the hospital, at 10:15 a. m., plaintiff's foot was examined by four house physicians connected with the hospital.   They concluded that prompt surgical treatment was necessary and telephoned to defendant, who is assistant surgeon of the Michigan Central Railroad.   Defendant arrived at the hospital at 10:45 a. m.   Upon examining the plaintiff, he found him unconscious, with a weak pulse and dilated pupils.   The foot was found to be cold and dead, the circulation having been interrupted.   Defendant testified that he learned from the house surgeon the boy's name and residence street.   With reference to the residence, he knew the distance from Harper Hospital and the time it would take to get from there to the hospital; that he inquired of the house surgeon if any one, any relatives, were present, and was informed that no person was present whatever. After consultation with the four house physicians, it was agreed by all that an immediate amputation was necessary to save the plaintiff's life.   The foot was amputated, and the plaintiff recovered.   It is the plaintiff's claim that his foot should not have been amputated at all, and particularly that it should not have been amputated without first obtaining his consent or the consent of his parents, who went to the hospital as soon as possible after learning of the accident.   A verdict having been directed in favor of defendant, the case is brought here for review upon writ of error.

BROOKE, J. (*after stating the facts*). The first question presented is whether it was necessary to amputate. Plaintiff offered the evidence of two physicians, Dr. Gottman and Dr. Gibbes, who testified that in their opinion the foot might have been saved. Dr. Gottman, who had been engaged as a general practitioner for 17 years, testified that in his practice he had treated one case like plaintiff's, and that he had never done any amputating of the lower extremities except a toe. He examined the foot the day after it was amputated. Upon cross-examination, he testified in part as follows:

"*Q.* Suppose the injury was so severe that the circulation had ceased, would you clean the wound and leave it?

"*A.* If the bone were all crushed and the parts all torn and I saw no chance, I would amputate.

"*Q.* Would you form your own opinion and judge whether amputation was necessary or not?

"*A.* I would call in counsel. I would not rely upon my own judgment. I would talk it over. Other people might see things differently than I did. Surgeons have differences of opinion. With proper consultation, it is a question which is the best course to follow under certain circumstances. I would call at least one surgeon, and if I was not satisfied with his statement, I would call another. We would talk it over and consider it.

"*Q.* Would you take their judgment?

"*A.* Certainly, we would talk it over and consider it. We are often in doubt in medicine.

"*Q.* There are conditions of emergency where a surgeon is confronted with dirt, and a serious wound to the lower extremities, for instance, the foot, where it is a matter of grave doubt, and requires calm judgment as to whether an amputation should be immediately performed or not?

"*A.* If the foot is all crushed and the bones crushed and the circulation destroyed, it is all splintered and the tissues are all gone, a lot of the tissues destroyed, then I would say, perhaps, it would be necessary to amputate, but perhaps not immediately, because there is no immediate hurry in the amputation of a foot of that kind, not within eight or ten hours, I don't think, unless—I don't know as I do know of any exception. * * * I would not always want to depend upon my own judgment, when

and where and how an amputation should be made in all cases. There are cases where amputation of the leg is necessary. It is for the surgeon to determine whether it is necessary or not, and he bases his determination on his best judgment.

"*Mr. Merriam:* It is a matter for the judgment and determination of the surgeon as to what time and in what manner and in what method an amputation shall take place?  *  *  *

"*A.* I do not know how to answer it.

"*Q.* Question repeated.  *  *  *

"*A.* There is only one way to answer it, and that is by 'Yes.'

"*Q.* Your answer is, 'Yes?'

"*A.* Yes, sir.

"*Q.* A surgeon must determine, must he not, when an amputation shall be performed, and from his judgment from all the circumstances of the case?  *  *  *

"*A.* I will answer that, 'Yes.' After he takes all the facts into consideration, then he may be wrong in his judgment.

"*Q.* And it is up to him therefore to determine from what he can learn of the case, and what he can see of the injury, to what extent the danger of blood poisoning is imminent?

"*A.* Yes, sir."

Dr. Gibbes, a physician, and instructor of many years' experience, making a specialty of the study of all forms of disease, examined the foot more than a year after amputation, and gave it as his opinion that the foot *might* have been saved. Upon cross-examination he testified in part:

"*Q.* Would you venture, from the professional skill that you have had in the years that you have been practicing your profession, an opinion of that kind without knowing the exact conditions of the patient at the time he was brought to the hospital?

"*A.* If I was in the fix that I am now, I would.

"*Q.* What do you mean by 'fix'?

"*A.* With a foot that has been in alcohol for a year, how could I do otherwise. If I could have seen the flesh conditions of the boy's foot when injured, it would have been a different thing.

"*Q.* If you knew the conditions of the boy when the

operation was performed, that might alter your opinion entirely ?

"*A.* I cannot tell; it might, of course.

"*Q.* Not knowing how the condition was, you still venture an opinion that that foot ought not to have been amputated ?

"*A.* On the conditions I find `there I base my opinion. I say on the conditions I find there, and nothing else. I don't know whether the circulation had entirely stopped in the foot or not. On the condition I saw I am ready to give an opinion. Other conditions might entirely influence my opinion; if I saw the end of the artery was torn out, and the circulation entirely stopped, it might alter it. I don't know whether the bone protruded from the foot after the injury. There is a longitudinal cut there, and I don't know how much was done by the accident. I don't know after the injury, after the boy was taken to the hospital, whether the foot was perfectly cold and the circulation had ceased entirely. If two hours after the injury the foot was still cold I would wait 24 hours, to see whether collateral circulation set in.

"*Q*: That would be for the judgment of the attending surgeon, assuming he was a competent surgeon ?

"*A.* I suppose so.

"*Q.* That is a fact ?

"*A*. That would depend upon where he was educated. There are a good many competent surgeons, but they look upon things with a different eye. They are not all taught the same.

"*Q.* Assuming that the man was a competent surgeon, and he was called in to attend this case, he would have to rely on his best judgment ?

"*A.* Yes, sir.

"*Q.* Taking everything into consideration ?

"*A.* Yes, sir. * * *

"*Q.* A surgeon finds himself on the horns of a dilemma, and when he finds himself between a shock killing the patient, and a decision between that and the possibility of dangers which are incurred by delay, he has to use his best judgment ?

"*A.* No, he calls in two or three more surgeons.

"*Q.* Suppose he calls in one or two more, and they all agree ?

"*A.* Then it is hard on the patient.

"*Q.* Then he is doing what seems best ?

"*A.* Yes, sir.

"*Q.* To those who have examined the patient at the time?

"*A.* Yes, sir. * * *

"*Q.* Suppose the boy remained unconscious three-quarters of an hour, what would that indicate?

"*A.* It would indicate a certain amount of shock; nothing very serious with the state of the part.

"*Q.* Would that three-quarters of an hour unconsciousness, would that indicate pretty severe shock to that boy's system?

"*A.* It would mean a shock, but nothing but what he could recover from.

"*Q.* Are you sure of that?

"*A.* I am not sure of anything.

"*Q.* What would the pulse be?

"*A.* I don't know.

"*Q.* How high a pulse would indicate a rather serious condition as to shock?

"*A.* In that boy?

"*Q.* We are not talking of any other boy.

"*A.* I don't know. I can't say from what I know or from what I have seen of the injury.

"*Q.* How high a pulse?

"*A.* I don't know what it would be in his case.

"*Q.* Could you from your experience tell what pulse would indicate a serious condition?

"*A.* No, considering it is about 20 years since I have had a case of that kind.

"*Q.* That pulse is a very important matter in the necessity of an operation?

"*A.* Yes and no.

"*Q.* You could not tell?

"*A.* You have to fit in each case that you have. You cannot give a general statement.

"*Q.* You are giving a general statement without considering those facts?

"*A.* I would not.

"*Q.* Do you want to eliminate the question of the boy's pulse in deciding the necessity of an operation?

"*A.* I am giving my opinion of what I have seen of the injury and what I have heard of the case. My opinion is not based on anything I don't know.

"*Q.* You would have a good deal more faith in your own opinion if you had attended the boy at the time?

"*A.* Yes, sir.

"*Q.* You would have a good deal more faith in some other competent surgeon's opinion that had attended the boy at the time?

"*A.* Than what?

"*Q.* Than your own now?

"*A.* Of course, a competent surgeon attending.

"*Q.* His opinion would be better than yours?

"*A.* Yes, I think it would."

Dr. Childs, a third expert called by plaintiff, testified:

"*Q.* In order for you as a surgeon to come to an intelligent conclusion whether an operation was necessary, would it be necessary to know the condition of the wound, the condition of the pulse, the temperature, the condition of the shock, and to know whether the wound was clean or dirty, how much hemorrhage there had been, and indication of that sort, before you could form a correct conclusion in your own mind what was necessary to do?

"*A.* I told you without seeing the case I could not give a positive opinion as to that because there is always other circumstances. An injury might be very small, and for all that it would be absolutely necessary that there should be an amputation for the very fact that there are extraneous matters injected into the wound, and I have had small ones and lost a life, and I have had large ones that you would think it almost impossible to save and saved them, so you cannot go by the magnitude of it. While larger ones always appear most aggravating, you have to take into consideration all the matter connected with it. There is no surgeon competent to give a decision. He is incompetent to decide or give a positive answer whether it is absolutely necessary at the time of that operation or not—indications might be that it was, and indications might be that it was not. The indications that would appear there that would make it absolutely necessary would be extreme. There would be cessation of the circulation, etc., and also extraneous matter. You cannot cleanse the wound any too quickly, and you should always cleanse the wound and tend to that thoroughly. You have to treat each case according to all appearances.

"*Q.* If as a skilled surgeon you had seen the patient, seen the foot torn and open, and observed his condition, the shock, the condition of the wound, his pulse, and all that,

and you concluded that the operation was immediately necessary, would you feel that your opinion was better and more apt to be correct than that of a surgeon or a doctor who saw the foot after the amputation had taken place?

"*A.* That can be answered in this way: That a man that made all those examinations and saw it, he might not be as competent after that to judge as some one else who had more experience and had seen those things oftener, and yet he might be absolutely correct, but his chances would be superior undoubtedly to the man who did see it. Still, although the foot afterwards might not indicate the necessity for amputation, yet the necessity may have existed.

"*Q.* A surgeon who saw it afterwards would not know anything about it afterwards, whether it was necessary or not?

"*A.* He would not know whether it was necessary for amputation so far as that is concerned, but the question would be whether an immediate operation would be necessary; that would be the question. The tarsal and metatarsal bones were dislocated, also the two cuneiform bones. The scaphoid bone was gone. That bone is still farther in the rear from the tarsal bones. The flesh was all denuded off the top and simply covered by some tendons—a few tendons here—and the muscular tissues were all gone.

"*Q.* There is often, from a severe traumatic injury, an injury from external violence; is there a serious condition from shock?

"*A.* Most always, lacerated wounds cause more severe shock. Shock is an interruption of the current of the nerve fluid which produces a reaction upon the circulation. Severe shock produces death many times.

"*Q.* Have you found in your practice that shock is continued and is progressive on account of the serious condition of the wound?

"*A.* Yes, I have seen it; yes, sir.

"*Q.* That fact is what makes surgical attendance immediately necessary?

"*A.* Yes, sir; and that is where immediate attention does come in, and sometimes—"

Taking all the testimony on behalf of the plaintiff and considering it broadly, it amounts, at most, to this: That

by following a different course plaintiff's foot *might* have been saved. While they disagree upon some details, they apparently all agree that the proper course for a surgeon to pursue, when confronted by such an exigency, is to consult with another or others, and then exercise the best judgment and skill of which he is capable. This seems to have been the course followed by defendant. The four house surgeons, after consultation with defendant, concluded, with him, that an immediate operation was necessary to save plaintiff's life.

Two experts, Drs. Kennedy and Brodie, surgeons of very wide experience, testified that in their opinion an immediate amputation was necessary to insure the plaintiff's life. It stands uncontradicted upon this record that the circulation in the foot was completely interrupted; that the foot was wholly devitalized; that the plaintiff was in a condition of profound coma from which the attending surgeons were unable to arouse him. It is also uncontradicted that death from shock frequently results from severe traumatic injury.

Taking into consideration the condition in which the plaintiff was when the defendant reached him, we have no hesitation in holding that defendant was amply justified in treating it as a case of emergency, and his conduct should be viewed in the light of the legal principles governing such cases.

In *Pepke* v. *Grace Hospital*, 130 Mich. 493 (90 N. W. 278), a physician, testifying for the plaintiff, being asked if it would have been possible to perform the operation so as to save any portion of the hand, replied:

" I think so; I would have tried it.
"*Q*. Could they have saved the thumb ?
"*A*. I think so."

This court said in comment:

" We do not think this testimony was of any probative force to show negligence on the part of the attending surgeons, or to justify the submission of the question of malpractice to the jury."

The testimony here commented upon was given by a surgeon who was present and witnessed a part of the operation. The case of *Mohr* v. *Williams*, 95 Minn. 261 (104 N. W. 12, 1 L. R. A. [N. S.] 439, 111 Am. St. Rep. 462, 5 Am. & Eng. Ann. Cas. 303), cited and relied upon by plaintiff, is not in point, because in that case there was no emergency. In the case of *Bakker* v. *Welsh*, 144 Mich. 632 (108 N. W. 94, 7 L. R. A. [N. S.] 612, 8 Am. & Eng. Ann. Cas. 195), this court held that in the case of a boy 17 years old, who himself consented to an operation which resulted in death, the father's consent was not necessary, and in that case also there was no emergency.

While, as hereinbefore pointed out, the testimony offered on behalf of the plaintiff was insufficient, in our opinion, to raise a question of fact for the determination of the jury as to whether the defendant was guilty of negligence through an error in judgment, the plaintiff's case would not be aided even if that issue were determined in his favor. In an ordinary action for negligence, the fact that defendant has acted according to his best judgment is no defense. His act is to be judged by the standard of conduct of an ordinarily prudent man under the circumstances. In conduct, resting upon judgment, opinion, or theory, however, a different rule has been recognized. This distinction has been well pointed out in the case of *The Tom Lysle* (D. C.), 48 Fed. 690, where it is said:

"The distinction between an error of judgment and negligence is not easily determined. It would seem, however, that if one, assuming a responsibility as an expert, possesses a knowledge of the facts and circumstances connected with the duty he is about to perform, and, bringing to bear all his professional experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, then want of success, if due to such course of action, would be due to error of judgment, and not to negligence. But if he omits to inform himself as to the facts and circumstances or does not possess the knowledge, experience,

or skill which he professes, then a failure, if caused thereby, would be negligence. 'No one can be charged with carelessness, when he does that which his judgment approves, or where he omits to do that of which he has no time to judge. Such act or omission, if faulty, may be called a mistake, but not carelessness ' "—citing *Brown* v. *French,* 104 Pa. 604; *Williams* v. *Le Bar,* 141 Pa. 149 (21 Atl. 525).

In *Staloch* v. *Holm,* 100 Minn. 276 (111 N. W. 264, 9 L. R. A. [N. S.] 712), the writer of the opinion, in commenting upon this exception to the general rule, says:

" One reasonable justification for this exception * * * is the elementary principle that when a man acts according to his best judgment in an emergency, but fails to act judiciously, he is not chargeable with negligence. * * * Physicians in the nature of things are sought for and must act in emergencies, and if a surgeon waits too long before undertaking a necessary amputation, he must be held to have known the probable consequences of such delay, and may be held liable for the resulting damage "—citing *Du Bois* v. *Decker,* 130 N. Y. 325 (29 N. E. 313, 14 L. R. A. 429, 27 Am. St. Rep. 529); *Martin* v. *Courtney,* 75 Minn. 255 (77 N. W. 813).

It would be unreasonable to hold a properly qualified physician or surgeon responsible for an honest error of judgment, where, as in the instant case, he is called upon to act in an emergency and must choose between two courses of action either one of which involves the possibility of the gravest hazard to the patient. As was said by Upton, J., in *Williams* v. *Poppleton,* 3 Or. 139:

"In cases like this the court and jury do not undertake to determine what is the best mode of treatment, or to decide questions of medical science upon which surgeons differ among themselves."

It is, we think, very clear upon this record that the question presented to the defendant, at the moment he was called upon to act, was one of judgment only. Instant action of some sort was imperative. In reaching a conclusion as to the proper course to be pursued, the attending surgeon must necessarily be influenced by many

considerations: The physical character of the wound, the fact that there was a compound dislocation of the bones of the foot, the entire absence of one of these bones, the stripping off of the flesh from the anterior part of the foot, leaving the tendons bare and shiny, the fact that the foot had become wholly devitalized, the presence of hemorrhage, the danger from blood poisoning at the time or from future infection, the character and quantity of foreign matter, dirt, cinders, etc., in the wound. To a consideration of these matters must be added a careful attention to the general condition of the patient, the degree and cause of the existing shock, the apparent ability or inability of the patient to resist shock, the condition of the temperature, pulse, and respiration, and the reaction or lack of it produced by the administration of stimulants. Called upon to act under such circumstances and to determine which of two courses (one entailing certain mutilation and the other probable death to the patient) should be followed, it is apparent that the defendant is not bound by the ordinary rules of negligence, but is entitled to insist that, having used his best judgment, he is not liable.

There is nothing in this record to indicate that, had the parents of plaintiff been present at the operating table, they would have refused their consent to the operation. Indeed, it is inconceivable that such consent would have been withheld in the face of the determination of five duly qualified physicians and surgeons that it was necessary to save the plaintiff's life. But defendant testifies, and in this he is not contradicted, that he made inquiry for relatives of the plaintiff and was told that none was in the hospital. Suppose that his informant was in error (which is not certain), the defendant had a right to rely upon the information and to act in the emergency upon the theory that to obtain consent was impracticable. In *Pratt v. Davis*, 224 Ill. 300 (79 N. E. 565, 7 L. R. A. [N. S.] 609, 8 Am. & Eng. Ann. Cas. 197), it was said:

"In such event a surgeon may lawfully, and it is his

duty to, perform such operation as good surgery demands, without such consent."

Upon the question involved in this case, a valuable collection of authorities will be found in *Gillette* v. *Tucker*, 93 Am. St. Rep. 657, note. See, also, 30 Cyc. p. 1587.

The fact that surgeons are called upon daily, in all our large cities, to operate instantly in emergency cases in order that life may be preserved, should be considered. Many small children are injured upon the streets in large cities. To hold that a surgeon must wait until perhaps he may be able to secure the consent of the parents before giving to the injured one the benefit of his skill and learning, to the end that life may be preserved, would, we believe, result in the loss of many lives which might otherwise be saved. It is not to be presumed that competent surgeons will wantonly operate, nor that they will fail to obtain the consent of parents to operations where such consent may be reasonably obtained in view of the exigency. Their work, however, is highly humane and very largely charitable in character, and no rule should be announced which would tend in the slightest degree to deprive sufferers of the benefit of their services.

The judgment is affirmed.

MOORE, C. J., and STEERE, McALVAY, STONE, and OSTRANDER, JJ., concurred. BLAIR and BIRD, JJ., did not sit.