### SHERWOOD v. BABCOCK.

1. APPEAL AND ERROR—EXCEPTION AS MATTER OF COURSE—DENIAL OF JUDGMENT NON OBSTANTE VEREDICTO.

Under section 1, Act No. 217, Pub. Acts 1915, if the request for judgment *non obstante veredicto* is denied, an exception in favor of the party making the request follows as a matter of course.

2. JUDGMENT — PHYSICIANS AND SURGEONS — MALPRACTICE — EVIDENCE—SUFFICIENCY.

In an action against a physician for malpractice, evidence of plaintiff in support of his theory that a child in his family, treated by defendant for pneumonia, died of cerebro-spinal meningitis and that other children in the family were exposed and thereby became afflicted therewith, while defendant treated them for typhoid fever, *held*, insufficient, and that a motion for a directed verdict *non obstante veredicto* should have been granted.

3. SAME—JUDGMENT ENTERED IN SUPREME COURT.
    Under section 2, Act No. 217, Pub. Acts 1915, where the
    Supreme Court finds that the trial court was in error
    in not entering judgment *non obstante veredicto*, as re-
    quested, judgment will be entered in this court.

4. APPEAL AND ERROR—ARGUMENT OF COUNSEL—TRIAL.
    It was prejudicial error, in an action against a physician
    for malpractice, for plaintiff's counsel, in his argument
    to the jury, without any basis therefor, to state that
    defendant was represented by an attorney for the insur-
    ance company.

Error to Kalkaska; Lamb (Fred S.), J. Submitted
November 4, 1919. (Docket No. 75.) Decided De-
cember 23, 1919.

Case by Wakeman L. Sherwood against Edgar B.
Babcock for malpractice. Judgment for plaintiff. De-
fendant brings error. Reversed, and judgment entered
for defendant.

*Douglas, Eaman, Barbour & Rogers,* for appellant.
*Patchin & Duncan,* for appellee.

STONE, J. This case has been brought here by de-
fendant upon writ of error, to review a judgment
against him for $1,000 in an alleged case of malprac-
tice. Defendant lived at Kalkaska, Michigan, and had
been practicing medicine 35 years at the time of the
trial. He is a graduate of the Detroit College of Medi-
cine and licensed to practice medicine in this State.
In April, 1917, defendant was called to the home of
the plaintiff to treat a grandchild of the plaintiff,
named Edwin Sen, and the child died on or about May
16, 1917. The case was diagnosed by the defendant
as pneumonia, and during the last stages of the illness
meningitis developed, and this was the immediate
cause of the death of the child. About the time of the
death of the Sen child, a child of the plaintiff, named

Irene, became ill, and died on May 30, 1917, the cause of her death being reported as typhoid fever. Later in the month of May two other younger children of the plaintiff, Edith and Imogene, were taken ill, and these children's cases were diagnosed as typhoid fever, by the defendant, and they were treated accordingly. The last two named children recovered from said illness. Soon after the death of Irene the defendant was discharged, and Dr. G. E. Tripp was called to take charge of the patients. Dr. Tripp never saw the Sen child, and was called into the case after the death of Irene. He saw and treated Edith and Imogene. At the time of his first call he was accompanied by Dr. A. S. Burrill, and Dr. Neihardt was also called in consultation on May 27th, and saw the three sick children of the plaintiff, as this was before the death of Irene. It is undisputed that the defendant consulted with Dr. Neihardt twice and with Drs. Burrill and Tripp once during his attendance upon the family. Dr. Burrill was also present when Dr. R. M. Olin, secretary of the State board of health, visited the two younger children after the death of Irene. A trained nurse was called on May 28th, about two days before the death of Irene. She testified as to the symptoms of the children and kept the chart of the cases.

Three claims of negligence are alleged in the declaration:

(1) For failure of the defendant to segregate the other children from Edwin Sen when he was taken ill.

(2) For failure to report the illness of Edwin Sen to the health board.

(3) In not treating the children for cerebro-spinal meningitis.

When Dr. Tripp was called the patients were convalescing, and he was called by the plaintiff as a witness. It is the claim of the defendant that there was no medical testimony introduced showing that the de-

fendant did not use the means ordinarily used in that community in diagnosing the diseases from which the children were suffering; and it is the claim also of the defendant that there was no testimony that any child had cerebro-spinal meningitis, and that on the contrary all the medical testimony was to the effect that all the children of the plaintiff were suffering from typhoid fever. The defendant testified that the child Edwin Sen did not have cerebro-spinal meningitis. His report of the death certified that he attended the deceased child, Edwin Sen, from April 28, 1917, until May 15, 1917, and saw him alive on the last-named date, the death having occurred May 16, 1917, at 10 a. m. The report contains the following:

"Cause of death was as follows: Meningitis. The contributory, pneumonia."

The record shows that the certificate of death in the case of Irene Sherwood gave the date of death as May 30, 1917, and the cause of death as typhoid fever. Dr. S. E. Neihardt, who was called in consultation during the time the patients were under treatment by the defendant, testified that he had treated hundreds of cases of typhoid fever, and that he saw no evidence of cerebro-spinal meningitis, but concluded that the children were suffering from typhoid fever. Dr. Burrill also testified that the children were suffering from typhoid fever. The plaintiff, during the illness of his children, complained to the secretary of the State board of health about the treatment given his children by the defendant, and Dr. Olin personally made an examination of two of the patients and the surroundings, and gave as his opinion that the children had typhoid fever.

The complaint of the defendant is that in spite of the fact that there was no medical testimony supporting the allegations in plaintiff's declaration, and that

all the medical testimony was in direct contradiction of these claims, the case was submitted to the jury and the verdict rendered and judgment entered for the plaintiff. The court seems to have submitted the case to the jury on the theory that they had a right to gather from the symptoms given by the plaintiff and his wife, which they observed during the illness of the children, coupled with the statement of Dr. Tripp that he treated the patients as though they were suffering from meningeal infection, whether or not Edwin Sen had cerebro-spinal meningitis, and whether or not the other children were suffering from the same disease. The court charged the jury that before the defendant could be liable they must be satisfied that the child Edwin Sen was suffering from cerebro-spinal meningitis and that if they decided that it was not cerebro-spinal meningitis a verdict must be rendered for the defendant.

It is urged that all the evidence showed that the child Edwin Sen did not have cerebro-spinal meningitis but pneumonia, which terminated in simple meningitis; and the distinction between meningitis and cerebro-spinal meningitis, a communicable disease, was pointed out. It is the claim of the defendant that there was absolutely no evidence of any failure on his part to use the ordinary means of diagnosing the cases as practiced in cases of a similar nature in Kalkaska and vicinity; and that there was no medical testimony that he made any error in diagnosing the cases.

So much stress was laid by the trial court upon the testimony of Dr. Tripp that it is well for us to examine that testimony somewhat minutely and at some length. He testified on direct examination that he had been in the practice of medicine 16 or 17 years at the time of the trial, and that he graduated from the Grand Rapids Medical College in 1901. He tes-

tified that the first time he saw the cases was with the defendant and Dr. Burrill, which was two or three days before he was called to treat the children, and before the defendant had been dismissed from the cases. He testified that on the first occasion defendant called him at the plaintiff's request, and that Irene was dead before he was called into the case, and that when he came into the cases the two children, Edith and Imogene, were the patients that were ill. Asked if he made a diagnosis of the cases he answered:

"I made a pretty thorough examination, and then Dr. Burrill and Dr. Babcock and myself retired to a room adjoining the sick room and had probably what you would call a diagnosis. After Dr. Babcock was dismissed from the cases and I had charge of them alone, I did not make a further diagnosis of the cases; I prescribed medicine for them and went on treating the children for the disease or sickness which they had.

"*Q.* Now, what symptoms did you discover in the case of the girl Edith, when you took charge of her case and started your treatment, doctor?

"*A.* Why, as far as the objective symptoms were concerned the girl was, of course, from her long illness —was pale and more or less emaciated and there was an absence of reflexes and, I think, the head was a little bit drawn to one side. And the subjective symptoms, the little girl had a temperature of—probably 102 or 102½, and a little tendency to coma. There was some conjunctivitis—redness of the eyes, and I guess that was about the only symptoms that I noticed.

"*Q.* Then had you learned in any way the history of the case, previous to the time that you had taken charge of the case?

"*A.* Only as the cases were talked over among the doctors.

"*Q.* Then all the information you had as to the history of the cases was from the statement of Dr. Babcock?

"*A.* Why, I presume that the family naturally would talk about their own cases.

"*Q.* And at the time that you had made your call— at the time that you say the diagnosis was made, all

the information you had as to the history of the cases was derived from the statement of Dr. Babcock?

"A. I believe it was, yes, sir.

"Q. And that was the only basis upon which you could make your diagnosis from the history—that is, the historical part of it?

"A. Well, we had, I believe, the case report, the clinical report of the nurse in attendance—Dr. Babcock's nurse; I wouldn't say that positively, but I think we had the report there.  *  *  *

"Q. Now in that report, or in giving you a history of the case, was the case of Edwin Sen, who had been in the family before, reported to you in order to assist you in making the diagnosis?

"A. I don't think so.

"Q. So your diagnosis was made independently of the history of the case of Edwin Sen?

"A. I believe so.

"Q. And also of Irene Sherwood's?

"A. Oh, I presume these things would have a direct or indirect bearing. It would be a natural thing in an illness of that kind to touch upon all those cases. *  *  *

"Q. Now, doctor, did you know at that time that the child Edwin Sen had died in that house and that his case had been reported as—the cause of death as meningitis, and that the patients that you were then examining had been associating and mingling with that patient during the time that he was ill with that sickness?  *  *  *

"A. Yes, I believe I learned from some source that Edwin Sen was supposed to have pneumonia, and died from meningitis.

"Q. Well, was that fact taken into consideration in your first—at the time you were in consultation with Drs. Babcock and Burrill on this case?

"A. Yes, I believe it was.

"Q. Now, you hadn't at that time examined the symptoms of those children yourself—the remaining children?

"A. Yes, I had.  *  *  *

"Q. Now, when you came into the cases to take charge of them yourself, did you learn anything further of the history of the cases from what you learned

at the time that you were there in consultation with Dr. Babcock?

"*A.* No, I don't believe I did, only as, probably Mr. or Mrs. Sherwood told me how the children died.

"*Q.* Did they tell you the symptoms that the other children had manifested?

"*A.* I presume so, as nearly as they could.

"*Q.* Now, had you heard, or had you known, outside of that, and before the time you came there the first time, as to whether these children were sick and what purported to be the ailment?

"*A.* Yes, sir.

"*Q.* And what was reported to be the ailment, doctor? ·

"*A.* I believe typhoid fever.

"*Q.* As to which children?

"*A.* Why, the children that were ill.

"*Q.* You had received that report from Dr. Babcock, hadn't you?

"*A.* I think that was generally reported in the neighborhood and throughout the country—throughout the town — that the Sherwood family had got typhoid fever. * * *

"*Q.* Now when you found and examined those children, doctor, on your own account, did you find symptoms there that would indicate the presence of cerebrospinal meningitis?

"*A.* No, sir, I did not.

"*Q.* Well, what would you say, Dr. Tripp, that the symptoms of cerebro-spinal meningitis were?"

The question was objected to because the witness said there were no symptoms of that, but the question was repeated.

"*Q.* What are the symptoms of cerebro-spinal meningitis?

"*A.* Why, in the history of the case I presume the child as a rule was taken suddenly, and with exaggerated train of symptoms and probably with a vomiting that you find—well, it is said to be a reflex from spinal irritations, that is, you might say a brain vomit, and you would get the spasmodic condition of the muscles perhaps, and arching of the back which pro-

duces a pain in the back of the neck and with high temperature, muscular movements and jerking.

"*Q.* What about the brain, or whether there would be delirium, doctor?

"*A.* Yes, sir, you would be apt to get a delirium.

"*Q.* And what condition would you expect to find the eyes in, in such a case?

"*A.* Well, I don't think that would be—why, inequality of the pupils or perhaps dilation, or maybe a contraction, but I don't think the condition of the eyes would be a positive symptom, that would be variable.

"*Q.* But there might be a dilation of the pupil?

"*A.* Oh, there might be, yes, sir.

"*Q.* And if you found a case that manifested these particular symptoms that you have now enumerated, you would expect that cerebro-spinal meningitis, was present?

"*A.* No, I don't really think I would, I would probably look for meningitis, something that would give you a cause of the meningeal trouble, whether it came primarily or secondarily from something else.

"*Q.* But you have enumerated some symptoms that are manifested in cases where the patient was afflicted with cerebro-spinal meningitis?

"*A.* Yes, sir.

"*Q.* Now, if you found the great number or the greater part of those symptoms manifested in a particular case, what would your conclusions be from that, as to whether or not they had spinal meningitis?

"*A.* I would think there was a possibility of their having spinal meningitis.

"*Q.* And if they manifested these symptoms that you have enumerated as being the prime symptoms and those direct or characteristic of that particular case, would you not say that that child or patient was afflicted with spinal meningitis from that?

"*A.* No, sir, I would not.

"*Q.* What other disease would manifest that same combination of symptoms?

"*A.* Well, there might be a meningitis from perhaps some other cause, I think I would go further in my diagnosis.

"*Q.* Well, what further would you do?

"*A*. I would probably have to have a laboratory diagnosis, before I imparted that intelligence to the family.

"*Q*. Then you think that all of those symptoms might be present and the laboratory diagnosis show some other ailment?

"*A*. No, it might verify my diagnosis.

"*Q*. But you could not attribute these symptoms to any other disease, could you, if you found those symptoms present there, the symptoms that would lead you to believe that the patient was afflicted with cerebro-spinal meningitis, wouldn't you?

"*A*. Well, now, I don't know whether you are making any distinction in the form of meningitis?

"*Q*. I am not.

"*A*. Well, then I would suspect spinal meningitis, yes, sir.

"*Q*. And unless you had some proof to the contrary, if those symptoms were manifested you would call the case spinal meningitis, would you not, cerebro-spinal meningitis?

"*A*. Well, I would probably have a further diagnosis in that particular case to verify my own ideas. * * *

"*Q*. Well, doctor, what would you do while you were getting the further diagnosis, what would you be treating the patient for?

"*A*. Well, I think, in any case, I would perhaps isolate this patient—in any case and wait.

"*Q*. If you found those symptoms there you think it would be sufficient cause to have the patient isolated?

"*A*. Yes, sir.

"*Q*. Then if you didn't find anything to the contrary from subsequent examination you would be satisfied in your own mind that the patient was afflicted with cerebro-spinal meningitis if it exhibited the symptoms you have enumerated?

"*A*. I would either do that or I would have to go on and treat it symptomatically, and meet those conditions as I found them, that is what anyone would do, I think. * * *

"*Q*. But you did segregate them?

"*A*. No, sir, I did not.

"*Q*. Then they had already been segregated at the time you took them?

208—Mich.—35.

"*A.* I think those cases were ill right there in the room, that is the way the house is arranged, those cases were there ill in the room just as they had been previous to that—Mr. Sherwood can tell you about that, but I know I did not take any special precautions as far as isolating those cases.

"*Q.* But you treated for symptoms you found—

"*A.* At the time.

"*Q.* And those were symptoms that would indicate that there was cerebro-spinal meningitis present, weren't they? * * *

"*A.* No, sir, there has been no diagnosis made of cerebro-spinal meningitis. * * *

"*Q.* Well, doctor, what did you treat the patients for, what particular disease?

"*A.* I treated those patients as though they were suffering from meningeal infection.

"*Q.* You mean by that an infection of the meninges of the brain and spinal cords?

"*A.* Yes, sir, of the brain and cords.

"*Q.* I ask you doctor, whether or not segregation is not one of the instructions from the health board, the health department, in all cases where meninges is present?

"*A.* Well, I really believe that if that is cerebro-spinal meningitis in its nature that that is what we are instructed to do.

"*Q.* Is there any medical distinction made between any other meningitis and cerebro-spinal meningitis?

"*A.* Why, yes, I believe there is."

At the close of the plaintiff's testimony, counsel moved for a directed verdict of no cause of action for the following reasons:

"*First.* In order to submit a case of malpractice to a jury it must be shown by expert testimony—that is, some doctor or medical man, that what the defendant did, or omitted to do, was not in accordance with the ordinary and usual practice in the community where he practiced.

"*Second.* It must be shown affirmatively by the plaintiff that on account of the failure to do something, or on account of doing something, that actual

damage resulted. In this case the record is absolutely barren in such testimony, there is not any professional expert testimony offered, I mean the testimony of any doctor that in the diagnosis of these cases, Dr. Babcock did not follow the usual ordinary practice of diagnosis in this community. The record is absolutely barren also as to the treatment that was given by the doctor; so there could be no hypothetical question asked as to whether it was the proper or ordinary treatment followed by physicians in this community. In order for plaintiff to recover they would have to show—

"(a) That the first child that died had cerebrospinal meningitis, a communicable disease. Because there is no testimony in this case that ordinary meningitis is communicable.

"(b) That the doctor knew at once that the child had this disease.

"(c) That the other children took this disease from it, there is absolutely nothing in this record, excepting the testimony that the others died of typhoid fever, all the doctors concur in that, and that is the record in the case, and it seems to me that every element to submit the case to the jury is lacking, and I ask the court to instruct a verdict of no cause of action in favor of Dr. Babcock."

The motion for a directed verdict was refused, and defendant was directed to proceed with the case. Again, at the close of all the evidence, the said motion for a directed verdict was requested in the following language:

"I want to again renew my motion for a directed verdict in favor of Dr. Babcock for the reasons I have already urged when I made the motion at the conclusion of the plaintiff's case, for the reason that it now shows conclusively on the part of all the doctors who visited those patients, that they had typhoid fever, and you cannot take typhoid fever for spinal meningitis. And even if Dr. Babcock was wrong in his original diagnosis of its being pneumonia instead of meningitis, there would be no blame attached to him because none of the other patients took

meningitis, but all of them typhoid fever. Your honor can see what a dangerous practice it would be, if we were to come in here and on the testimony of the father, mother and grandmother, those interested, who would detail one after the other all the symptoms, which they seem to know by heart, of spinal meningitis, and then say that the jury can speculate from that, in view of the absolute testimony of four reputable physicians that they had typhoid fever, and allow the jury to speculate whether those children had typhoid fever or spinal meningitis, and it has not been shown that if the doctor did follow the rule in regard to reporting to the health officer, it is shown that the health officer of this State has exonerated him, and if he did violate that rule it has not been shown that any damage came from that."

After a somewhat lengthy colloquy between counsel upon both sides and the court, the court said:

"Well, I think I will submit it to the jury upon those two propositions and reserve the right under the 1915 statute to set aside the verdict, if I am satisfied that it was wrong, or satisfied that I am wrong";

—and the case was accordingly submitted to the jury.

After the verdict, and before judgment, a motion to direct a verdict *non obstante veredicto*, and for a new trial, was entered. It appears to be a sort of combination motion, the request being:

(1) Because the court erred in refusing to direct a verdict for the defendant on the ground that there was no competent evidence showing that the defendant was guilty of any negligence.

(2) Because the court erred in submitting to the jury the question as to whether or not the children of plaintiff died of cerebro-spinal meningitis or typhoid fever, as this question is purely a scientific one, and could only be passed on by the jury, provided there was evidence of some doctor that the plaintiff's children did die of cerebro-spinal meningitis, and the record was absolutely barren of any such testimony.

(3) Because the court erred in charging the jury that the only evidence that the grandchild died of

cerebro-spinal meningitis was the evidence of the family and Dr. Tripp. This was error because Dr. Tripp testified that he never saw the grandchild, and that he saw no symptom of cerebro-spinal meningitis in the Sherwood children.

(4) Because, under the charge of the court, the jury were allowed to speculate as to whether or not the children died of typhoid fever or cerebro-spinal meningitis; which speculation could only be based on lay testimony, as the five doctors who testified stated there were no symptoms of cerebro-spinal meningitis.

(5) Because said verdict is contrary to the great weight of the evidence.

This motion was denied, and judgment entered for the plaintiff upon the verdict.

It should be stated that in the course of the argument of the case to the jury one of plaintiff's counsel used the following language:

"It is for you gentlemen to say whether Dr. Babcock or the insurance company, whose very able attorney is here today—

"*Mr. Barbour:* We object to that remark; there is no insurance company here today nor in this case at all.

"*The Court:* There is no insurance company here at all, and the remark is uncalled for."

In the course of its charge to the jury the court used the following language:

"Now, during the progress of the trial, some statements have been made by counsel, and some of them have not been warranted or justified by the testimony. I have tried to intimate to you that the trial should be had upon the testimony that is admitted in the case, and upon that alone, and not upon the statements of counsel, unless they are borne out by the testimony; you may use the statements and arguments of counsel, so far as they are borne out by the evidence in the case, and use them in determining what the facts are; if they have gone outside, then don't use what they have said in going outside for any purpose; be careful

about that, simply confine yourself to the testimony and these instructions I have given you."

In his assignments of error the defendant claims:

(1) That the court erred in denying the motion for a directed verdict on behalf of the defendant made at the termination of the plaintiff's case.

(2) Also in denying the motion for a directed verdict at the termination of the defendant's case.

(3) That the court erred in not declaring the case a mistrial on account of the argument of counsel, above set forth.

(4) Also that the court erred in certain portions of the charge.

(5) And, lastly, that the court erred in denying defendant's motion for a new trial.

1. In the discussion of the case appellant's counsel urged that the rule of law, both in this and other States, is that a physician is not liable for errors in diagnosing a case or for errors in judgment, provided he uses the means ordinarily used by physicians practicing in that or similar communities, and the following cases are cited: *Pelky* v. *Palmer,* 109 Mich. 561; *Luka* v. *Lowrie,* 171 Mich. 122 (41 L. R. A. [N. S.] 290).

2. That in order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities, and on the failure of the plaintiff to produce any such evidence, he has failed to establish his claim, and the following cases are cited: *Farrell* v. *Haze,* 157 Mich. 374, 379; *Miller* v. *Toles,* 183 Mich. 252 (L. R. A. 1915C, 595). From a careful reading of this record we are impressed with the fact that the verdict and judgment entered are contrary to the great weight of the evidence in the case. Defendant

has, however, failed to file any exceptions to the refusal of the court to grant a new trial. That matter, to wit, that the verdict was contrary to the great weight of the evidence, is embraced in the motion for a directed verdict *non obstante veredicto.* The statute is peculiar upon that subject and provides (Act No. 217, Pub. Acts 1915, § 1 [3 Comp. Laws 1915, § 14568]) :

"If such request is denied an exception in favor of the party making such request shall follow as a matter of course."

The question as to the weight of evidence is akin to the questions raised upon the motion for a directed verdict. We are impressed with the claim that a judgment should have been entered in favor of the defendant notwithstanding the verdict of the jury, and that the court erred in overruling such motion. A careful reading of the testimony of Dr. Tripp shows that it falls far short of furnishing evidence that any of the children had cerebro-spinal meningitis. He used the words "possibility," "suspect" and "perhaps." The testimony was too problematical and speculative to warrant the submission of the question to the jury. It gave the jury an opportunity to speculate, and the evidence failed to make a case of malpractice.

We are also impressed with the claim that it was prejudicial error for counsel to use the language he did in the argument to the jury, as above set forth. This language was not only improper, but was reprehensible, and was used without any provocation, there not being a word of testimony in the case with reference to an insurance company. We had occasion in the case of *Morrison* v. *Carpenter,* 179 Mich. 207, 221 (Ann. Cas. 1915D, 319), to reverse a case for the improper argument of counsel—one where the language used was no more damaging than it was here, and a large number of cases are there cited. See, also, *Peter* v. *Railway Co.,* 121 Mich. 324, 330 (46 L. R. A.

224). As the case must be reversed on other grounds we need not determine whether this error was cured by the charge of the court.

Upon the whole record we think that the plaintiff failed to make out a case. Even from the testimony of Dr. Tripp as to assumed symptoms which would cause one to "suspect" the presence of cerebro-spinal meningitis, there was not sufficient evidence upon that subject to warrant the submission of the case to the jury. The charge gave them an opportunity to speculate as to whether cerebro-spinal meningitis was present or not in the family of the plaintiff.

For the reasons above stated, the judgment of the court below is reversed with costs to appellant. Judgment notwithstanding the verdict is ordered to be entered for the defendant in accordance with the statute, and the case is remanded for such purpose.

BIRD, C. J., and SHARPE, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.