GEORGE F. SULLIVAN and Another, Plaintiffs, *v.* CHARLES H. MONTGOMERY, Defendant.

City Court of New York, Bronx County, May 8, 1935.

*Michael A. Hayes* [*John J. Tullman* of counsel], for the plaintiffs.

*Lorenz J. Brosnan* [*Morgan J. Burke* of counsel], for the defendant.

SCHACKNO, J. This is an action brought by George F. Sullivan against the defendant to recover damages for alleged malpractice and for an assault predicated upon the theory that the defendant anæsthetized the plaintiff without his consent or that of his parents. Joseph E. Sullivan, the father of the said George F. Sullivan, asserts

a claim for loss of earnings, services and medical expenses incurred by him as the result of the alleged malpractice and assault. The defendant is a duly licensed and practicing physician, with an office in the borough of Bronx, New York city.

On June 9, 1930, the plaintiff George F. Sullivan, who was then upwards of twenty years and four months of age, played baseball in a lot located on Webster avenue and One Hundred and Seventieth street, New York city; while running between the second and third bases, he slipped and fell to the ground, but got up and continued running around the bases until he reached the home plate; after he got to the home plate, his ankle swelled; he was then taken in a cab to the office of the defendant, who, after inquiring as to what had occurred, placed him on a table, removed his sock and shoe, examined the ankle and informed him that he would have to give him ether; Sullivan consented to being anæsthetized; his testimony is as follows: " I told him [the defendant] I had hurt my ankle and he said ' Let's see it;' he put me on the stretcher or a table and he looked at the ankle  *  *  *  and then said he would have to give me ether. *I said, ' Well if you think it best, go ahead.' "* (Italics mine.) Ether was thereupon administered, the ankle set and a cast placed thereover.

The plaintiff Joseph E. Sullivan, the father of the plaintiff George F. Sullivan, contends that the defendant should be held liable because he did not first obtain his consent to the administration of the anæsthetic to his son; he did not accompany his son to the defendant's office; in fact, he did not know of the accident until the defendant or his wife communicated with him; he arrived there as his son came out of the anæsthetic and after his ankle had been set and the cast placed thereover; the following then occurred: " I asked him [the defendant] what the trouble was; he [the defendant] said he [his son] had a fractured ankle. I said well why did you have to put him under an anæsthetic without getting in touch with me first;" to which the defendant made no reply but called attention to the fact that he had not been paid for his services.

While the courts are not entirely in harmony upon the question of consent to the administration of an anæsthetic, the better reasoning supports the proposition that, if a physician or surgeon is confronted with an emergency which endangers the life or health of the patient or that suffering or pain may be alleviated, it is his duty to do that which the occasion demands within the usual and customary practice among physicians and surgeons in the same locality. Many persons are injured daily in our city and emergency cases constantly arise. To hold that a physician or surgeon must wait until perhaps he may be able to secure the consent of the parents,

who may not be available, before administering an anæsthetic or giving to the person injured the benefit of his skill and learning, to the end that pain and suffering may be alleviated, may result in the loss of many lives and pain and suffering which might otherwise be prevented. I do not believe that those who have devoted their lives to humanity will wantonly administer an anæsthetic or fail to obtain the consent of parents before administering an anæsthetic where such consent may be reasonably obtained in view of the exigency; it would be altogether too harsh a rule to say that under the circumstances disclosed by the testimony in the instant case, the defendant should be held liable because he did not obtain the consent of the father to the administration of the anæsthetic; as the defendant was confronted with an emergency and as he obtained the consent of his patient, I hold that the consent of the father was not necessary. (*Schloendorff* v. *New York Hospital*, 211 N. Y. 125; *Luka* v. *Lowrie*, 171 Mich. 122; 136 N. W. 1106; *Bakker* v. *Welsh*, 144 Mich. 632; 108 N. W. 94.)

This brings me to the action for malpractice.

Plaintiffs contend that the defendant failed to properly diagnose the condition of the plaintiff and should have had X-ray pictures taken before setting the ankle and placing it in a cast, and that in failing to do so, defendant did not use the care and skill recognized by those in his chosen profession under like circumstances in the borough of the Bronx.

It is ancient learning that a physician or a surgeon is bound only to bring to the service of his patient and to apply to the case that degree of knowledge, skill and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities (*Wells* v. *World's Dispensary Medical Assn.*, 9 N. Y. St. Repr. 452; *Becker* v. *Janinski*, 15 N. Y. Supp. 675); it is his duty to use reasonable care and diligence in the exercise of such skill and the application of his learning, and to act according to his best judgment; he does not impliedly guarantee results. (*Benson* v. *Dean*, 232 N. Y. 52; *Pike* v. *Honsinger*, 155 id. 201; *Brown* v. *Goffe*, 140 App. Div. 353; *Wood* v. *Wyeth*, 106 id. 21.) Whether the defendant exercised the degree of care and skill required of him cannot be determined from the testimony of laymen or non-experts, since it is only those learned in the profession who can say what should have been done or what was done ought not to have been done. (*Robbins* v. *Nathan*, 189 App. Div. 827; *Brown* v. *Goffe*, 140 id. 353; *Lubbee* v. *Hilgert*, 135 id. 227.)

Dr. Sullivan, called as a witness by the plaintiffs, testified that he first saw the plaintiff George F. Sullivan on June 13, 1930, and that as he did not see any evidence of a fracture, he sent him to a Dr.

Hirsch, an X-ray specialist, for the purpose of having X-ray pictures taken. As to the defendant's treatment, he testified: "Q. In other words a clinical diagnosis of a very simple fracture without fragment, without displacement, dislocation, with malunion, can be as easily diagnosed by a clinical diagnosis as an X-ray diagnosis? A. You are trying to prove that the X-ray is infallible. I am going to say that it is not. The fracture can be there and the X-ray won't show it. Q. Now, with no apparent injury to the boy's ankle, when you saw it at the time that the cast was removed by you, you still want us to believe that you reapplied that cast? A. Yes; why not? Q. Is that the proper and usual therapy in such instances? A. That is very good therapy. You could not immobilize it with anything better than plaster. Q. But, Doctor, you found no injury there; what was the purpose of immobilizing the leg? A. We had a history of injury, didn't we? Q. But you had X-rays taken subsequent to that history; you had your own examination? A. There is injury to soft parts. You are talking about X-ray of bones. * * * Q. And Doctor, do you say that the usual accepted method of therapy for treating a swollen and discolored ankle is by immobilizing it in a plaster of Paris cast? A. Immobilize it any way you like; that is a matter of choice. Q. What is the approved method, Doctor? A. There are a number of methods of immobilizing joints. There is no one approved method."

He further testified that the plaintiff George F. Sullivan received emergency treatment from the defendant and that when the latter treated him he may have had a dislocated ankle and that he (Sullivan) "left good enough alone and it was good enough when I [he] saw it."

Dr. Hirsch, also called as a witness by the plaintiffs, testified that where there is a fracture without any displacement or over-riding, it is very difficult to determine whether there is or whether there is not a fracture and that while from an examination of the X-ray pictures, he could not see a fracture, the thickness of the cast might have obscured it and he could not state whether there was or whether there was not a fracture. As to whether the defendant should have had X-ray pictures taken before setting the ankle and placing it in a cast, he testified: "Q. Now, Doctor, will you tell us whether or not the X-ray is an approved method in general use in the County of Bronx to be used for the purpose of diagnosing a fracture where there is no dislocation and displacement of the bones? A. The rule is that whenever you get a history of injury whether there is — whether you think there is a fracture there or not, or whether you think there is a dislocation or not, first treat your patient, immobilize it, keep the part in position, as it is. Try

452

to prevent any pain; then order an X-ray examination to confirm your clinical opinion."

When the defendant called at the plaintiffs' home a day or so after he had treated the plaintiff (George F. Sullivan) he was informed that his services were no longer required and that they (plaintiffs) would get their own physician.

On the expert testimony before me, the defendant was competent to set the ankle and did so with judgment; no expert called by the plaintiffs in this case testified that an X-ray picture was necessary or that the ankle should not have been set without an X-ray; according to the plaintiffs' experts, the treatment of the defendant was proper. There is no merit in their complaint and no justification for their charges which should never have been made.

Complaint dismissed, with costs.