Quinn, J.
(dissenting). When plaintiff’s late husband failed to return from work -within three or four hours of his habitual homecoming time of ¡6:30 p.m., on August 31, 1967, and she had no other word of him, plaintiff began a search, in aid of which, the next day, September 1st, she enlisted the help of the New York City Police Department. Tavo members of the New York City Police Department’s detective bureau aided her in her search; one from .the Missing Persons unit and one from the detective bureau’s office in the police precinct of her residence. *392 Not until one week later, on September 8, 1967, did the search prove successful when the detective assigned to the search •from the Missing Persons unit personally brought plaintiff word that her husband had been pronounced dead on arrival at the emergency room of Fordham Hospital on the evening of August 31, 1967 and his remains lay at the Bronx morgue. For the mental anguish and worry to which plaintiff was subjected by the prolonged uncertainty, while her one week’s search went on, she has recovered a verdict of $5,000 against the City of New York for damages for psychic injury due to negligence in not helping her to conclude the search ¡sooner.
Plaintiff’s sad plight makes such a strong appeal to natural sympathy it becomes a most unhappy and unpleasant task to venture the opinion that the applicable law and the evidence, viewed most favorably from plaintiff’s standpoint, require reversal and dismissal of the complaint.
The evidence is clear, and there is no claim by plaintiff to the contrary, that the City ,of New York at .all times kept the body of the deceased with the respectful care due human remains and was ready, willing and anxious to surrender those remains to la righful claimant, as indeed it did to plaintiff immediately upon her identification as the widow. In the absence of a prior demand there could be no withholding of the remains, unlawfully, negligently or otherwise.
The general duty of the New York City Police Departmeut to aid persons in a search for missing relatives or friends can hardly be regarded as greater or different from the general duty to protect threatened persons from becoming victims of crime; yet a failure to afford forseeably needed protection to an endangered individual has been held to give rise to no right of action against the City of New York to the person so victimized (Riss v. City of New York, 22 N Y 2d 579). The general duty of the New York City Police Department to aid in a search for missing persons can hardly be regarded as greater or different from the general duty to aid persons involved in accidents in obtaining data on the identity of other active participants, potentially liable as tort-feasors; yet failure .of ia police officer, on the scene of a motor vehicle accident, to keep .his express promise to an injured person to obtain the name, license or motor registration number of the operator of an automobile in collision with a motorcycle, has been held to give rise to no right of action against .the City of New York to the injured motorcycle driver thereby despoiled of ¡any hope of recovery for his injuries through lack of essential *393 identifying information his own obviously disabled condition prevented him from obtaining (Falco v. City of New York, 34 AD 2d 673, affd. 29 N Y 2d 918).
But even if the instant case can be distinguished from the above-cited authorities, and numerous forerunners on which they are based, the delayed success in aiding plaintiff’s search cannot be laid to negligence by the Police Department. Nobody suggests there was any lack of diligence by the police in making day by day inquiries in a number of directions, even outside the City of New York, and making day by day reports to plaintiff on the progress of the efforts of the police to help her in her search. The very worst that can be said is that the detective in .the Missing Persons unit on the basis of his long experience made a nonculpable mistake of judgment, relying heavily on the far from unreasonable likelihood, and fond hope, that the plaintiff’s late husband was alive, suffering a defect of memory or consciousness, rather than dead, so that he conducted his daily inquiries more zealously along avenues of information normally leading to the whereabouts of living persons. Not until almost a week had passed did he concentrate on sources, which hindsight now suggests he might better have started with, on the grimmer theory that plaintiff’s husband was dead and the daily routine system of reported deaths, he had been faithfully scanning, had somehow broken down in this case.
An honest error of judgment does not give rise to a cause of action in negligence, especially where the judgment in question rests on theory and opinion (65 C. J. 8., Negligence, § 2 [8], p. 472). “ In the light of the wisdom that follows the event, we can see that the outcome might have been better if they had done something else. That is not enough ”. (Wolosynowski v. New York Cent. R.R. Co., 254 N. Y. 206, 209.) “ Liability for negligence needs a firmer foundation than mere error of judgment.” {Kawacs v. Delaware Lackawanna <& Western R. R. Co., 259 N. Y. 166, 169, citing Wolosynowski v. New York Cent. R.R. Co., supra.) The police action in this case fits exactly the proposition that “if one, assuming the responsibility as an expert, possesses a knowledge of the facts and circumstances connected with the duty he is about to perform, and, bringing to bear all his professional experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, then want of success, if due to such course of action, would be due to error of judg *394 ment, and not to negligence. ’ ’ (Luka v. Lowrie, 171 Mich. 122, 132.)
The claim of the plaintiff, filed with the Comptroller of the City of New York, specifies an ‘ ‘ Action for psychic injury against the City of New York more particularly the Department of Hospitals and Police Department in negligently failing to locate the body of deceased Joseph Patrick Finn after notification of his being missing.” The proof, of course, belies the claim of negligent failure to locate the body of the deceased and tends only towards establishing a failure to locate the body of the deceased within a reasonable time (i.e., some unspecified, conjectural time less than seven days) after receiving the appeal for aid in searching for him as a missing person.
The involvement of the Department of Hospitals in this unfortunate contretemps springs from the excusable mistake or error of judgment of a nurse at the emergency room of Fordham Hospital in regarding the uniformed police officer, accompanying the body of the deceased, as constituting the presence of a police officer such as, under the rules and regulations of the hospital, relieved her of independently notifying the New York City Police Department of the arrival of a dead body at the emergency room. The uniformed police officer who came to the emergency room of "Fordham Hospital in the ambulance, bearing the body of the deceased, was a police officer of the New York City Transit Authority, a body corporate, separate and distinct from the City of New York. His identity as such was to be distinguished, by a keen observer intent upon such nice details, from that of a uniformed officer of the Police Department of the City of New York, by a three-inch, round orange patch on the left sleeve, ‘ ‘ with a little train on the patch. ’ ’ This uniformed police officer, accompanying the body of the deceased, assiduously noted down in writing all identifying information which the nurse furnished him at his request, in the course of her search of the body of the deceased. "Whether she mistakenly took him to be a uniformed police officer of the Police Department of the City of New York, or recognizing him as a police officer of the Transit Authority, assumed that he could be fully trusted to officially report the death in like manner and through the same channels as a police officer of the New York City Police Department, it can hardly be .said that any misapprehension she may have been under, in either regard, arose from negligence, i.e., a failure to use that degree of care which a reasonably prudent person in her situation would have used to avoid foreseeable injury to another. “The risk reason *395 ably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension”. (Palsgraf v. Long Is. R.R. Co., 248 N. Y. 339, 344.)
The only statutory duty laid on anybody to report the death (Public Health Law, § 4140; Administrative Code of City of New York, §§ 878-1.0; 878-2.0) was undoubtedly fully discharged within 24 hours, as appears from that part of the records of the New York City Department of Health, in evidence, entitled “Medical Certificate of Death”, dated September 1, 1973, over the signature of the Assistant Medical Examiner.
The nurse’s duty to make an independent report of bodies of dead persons arriving at the emergency room unaccompanied by a police officer, was owed to the hospital and perhaps to the Police Department. There is no suggestion that she had any duty to seek out or furnish such information to the relatives of such deceased persons. Unless she were clairvoyant she could scarcely be charged with the responsibility to foresee that even though the uniformed police officer who in her presence, took down all necessary information relevant to the identity of the deceased person would, indeed, faithfully relay all such information by phone and by written record to his designated offices and superiors for transmittal to the New York City Police Department, in accordance with invariable practices under the rules and regulations of the Transit Authority, yet somehow the record-keeping and record-relaying processes and facilities of the Transit Authority would strangely and unaccountably fail, in this one instance, to follow standard reporting practices; so that the lack of such report would lead a detective of the Missing Persons unit in aiding plaintiff’s search for her husband, to initially discount the likelihood of death and proceeding on the theory that plaintiff’s husband was still alive, direct his inquiries principally to the information desks of city hospitals for live patients admitted, rather than to the emergency rooms, as he eventually did, for bodies of persons dead on arrival, and that plaintiff would thereby suffer five or six days ’ prolongation of her anxiety and uncertainty over the whereabouts and condition of her husband.
The direct, proximate cause of plaintiff’s failure to receive an earlier report of her husband’s death by sudden heart failure, while a passenger on the facilities of the Transit Authority, was not the emergency room nurse’s nonfeasance resulting from failure to distinguish the uniformed Transit Authority policeman from his all but identical uniformed counterpart on *396 the New York City Police force, or her failure to distrust the eventual effectiveness of his apparent official activity and seeming diligence to take down all necessary information for police purposes, including standard reporting procedures. The direct proximate cause of the delay in plaintiff becoming apprised of her husband’s death was either the failure to inquire at the Medical Examiner’s office or the failure of the records office of the Transit Authority, in accordance with regular procedures, under established practices and its own rules and regulations, to transmit its timely received report of death to the New York City Police Department where it would have come under the daily record-searching eye of the detective from the Missing Persons unit, within 24 hours-after the event, and saved plaintiff the needless emotional strain on her nervous system which the five or six days ’ extra wait entailed.
Defendant’s motion at the close of all the evidence to dismiss the complaint for failure to prove actionable negligence should have been granted.
Fixe, J. P., and Lupiaxo, J., concur in Per Curiam opinion; Qttixx, j., dissents in memorandum.
Judgment reversed, etc.