[S. F. No. 15076. In Bank.—August 29, 1934.]

JOSEPHINE N. S. CALLAHAN, Respondent, v. HAHNE-
MANN HOSPITAL et al., Defendants; THOMAS H.
McGAVACK et al., Appellants.

Redman, Alexander & Bacon and Herbert Chamberlin for Appellants.

Garton D. Keyston, Grove J. Fink and M. Mitchell Bourquin for Respondent.

THE COURT.—This cause was ordered transferred to this court after decision by the District Court of Appeal for the reason that we desired to give further consideration to some of the questions presented on the appeal and determined by said decision. After a careful study of the briefs and arguments of the parties hereto, we are of the conclusion that the opinion of the District Court of Appeal, with the deletion of certain portions not necessary to said decision, correctly determines all questions both of law and

fact in issue between said parties. The opinion, written by Mr. Justice Spence, as modified, we approve and adopt as the opinion of this court. It is as follows:

"Plaintiff sought to recover damages for alleged malpractice. The defendants were the Hahnemann Hospital, at which plaintiff was treated; C. J. Burnham, now Dr. Burnham, who was then an externe at the hospital and who administered to plaintiff certain injections; A. Walter, a nurse who assisted Mr. Burnham, and Doctors Thomas H. McGavack and James W. Ward, the doctors in charge of the treatment of plaintiff. A nonsuit was granted as to the defendant A. Walter and the jury returned a verdict in favor of the defendant hospital and the defendant Burnham. From a judgment on the verdict in favor of plaintiff and against the defendants, Dr. McGavack and Dr. Ward, said defendants appeal.

"The main questions involved on this appeal relate to the sufficiency of the evidence to sustain the verdict and judgment. We shall therefore proceed to set forth the evidence in some detail. In doing so we are mindful of the general rules controlling the action of appellate courts where the claim is made that the evidence is insufficient, but before testing the sufficiency of the evidence offered on behalf of plaintiff, we believe it proper under the circumstances before us to set forth some of the evidence of the attending physicians who were the only experts who saw plaintiff at or near the time of the treatment.

"Plaintiff's claims arise out of the treatment given her following an operation necessitated by a ruptured appendix. The results of the operation appear to have been entirely satisfactory and it is apparently conceded that said operation was skilfully performed. The subsequent treatment complained of consisted of the subcutaneous injection of a saline solution containing glucose.

"Plaintiff was a woman approximately 65 years of age. As early as 1890 she had experienced trouble with her appendix, but after being taken to a hospital she had jumped off the operating table. In July, 1928, the condition of her appendix became acute and she consulted Dr. McGavack. With plaintiff's consent, Dr. Ward, a surgeon of 49 years' experience and a specialist who had performed some 4000 abdominal operations, was called into consultation. The

doctors recommended immediate operation and plaintiff was taken to the hospital. All preparations for the operation were made, but plaintiff changed her mind and left the hospital in an ambulance against the advice of the doctors. Her condition finally became very critical and she again consulted the doctors and agreed to undergo the necessary operation. On July 27, 1928, she was rushed to Hahnemann Hospital in an ambulance and was operated upon without delay. The anesthetic was administered by Dr. McGavack while the operative work was performed by Dr. Ward with the assistance of Dr. Cookingham. The operation revealed that the appendix had ruptured and that plaintiff was in the last throes of peritonitis.

"Before describing the treatment which followed we will quote some of the testimony relating to plaintiff's condition before and immediately after the operation. Dr. McGavack testified: 'A. We found conditions again worse, evidently with an appendix that had already ruptured, as her pain had become general through the entire abdomen, and she ceased to breathe with the abdominal muscles at all, and her temperature was somewhere around 102 and 102½, her pulse was much weaker, and at times intermittent, in contrast to what it had been on July 19th. She was beginning to show the type of face that we find with peritonitis, which is a pinched drawn expression, more or less of shock and fear, with cold extremities, and at that time some failing of the extremities in the hands and feet. Needless to say, at this time hospitalization seemed imperative, and every measure was attempted which might help her, even though she refused hospitalization. I might add that another feature, of course, was the onset by this time of marked dehydration, inasmuch as from July 19th until July 24th she had taken practically no fluid, and what fluid had been taken had been vomited, so that we were dealing with a very much dehydrated and toxic individual. Q. Dehydrated means what, Doctor? A. Decreased water in the tissues; removal of necessary fluids from the tissues. Those that are necessary for proper circulation. Q. And that she was very toxic means what? A. That she was very toxic means somewhat the picture I described, that she was absorbing poisons through an area in her abdomen, which was affecting her whole system, paralyzing the circulation, and paralyzing

almost every function of the body. Q. And if that condition is not changed what is the ultimate result? A. The ultimate result could only be one thing. Q. What is that? A. Death.'

"Dr. Ward testified as to her condition at the hospital just before the operation as follows: 'A. Very bad; she had gone from bad to worse; she was in the throes of general peritonitis; the abdomen was distended and very tender; she was mentally dull and the lips blue and the fingernails blue and the nose pinched; the temperature was about 102 or 103—I don't exactly recall; the pulse accelerated and intermittent — only a certain number of beats coming through to the wrist. In all, a very bad picture. Q. You mean that the chance to save life seemed slim? A. Very slim. It was with a good deal of courage that I undertook to do for her, but I wanted to save her if I could. Q. You had a fear that she would die on the table? A. A very great fear.'

"Plaintiff's condition immediately after the operation was described by Dr. McGavack as follows: 'A. When she returned from the surgery her condition was even more critical, owing to the necessary shock of an operative procedure. She returned to her room with cold extremities, blue cyanosed extremities; her heart beats were much more weakened than before; her pulse was very rapid, running from 140 to 150 at the heart, and at the pulse the circulation was so weak the patient would not come through to the pulse, the wrist, and it was possibly only about 30 or 40 beats each minute. The pinched and drawn toxic expression of the face was present, and all the tissues were dehydrated. In other words, she was suffering from the shock of an operation, plus the most toxic type of absorption from the appendix that had been ruptured at least eight days. Q. Was she dying? A. Yes.'

"Dr. Cookingham gave the following answers to questions relating to plaintiff's condition at that time: 'Q. What opinion did you have—did you have following the operation—of the chances for the lady to live or die? A. That she would not recover. Q. You thought she would die? A. I did.'

"Dr. Ward stated that during all of his experience with cases involving abdominal surgery he had never encountered

a worse case than plaintiff's in which the patient had re-covered.

"Following the operation the doctors were confronted with the problem of sustaining the life of the patient. Dr. McGavack, Dr. Ward and Dr. Cookingham held a consultation and formed the judgment that it was essential to inject a saline solution containing 10 per cent of glucose in order to save plaintiff's life. The soundness of their judgment in this regard is not questioned. It further appears that the use of such solutions containing up to 50 per cent glucose is a recognized and approved method of treatment. Having arrived at the above-mentioned conclusion, the three doctors then discussed the question of the method of injecting the necessary fluid and nourishment. It appears that there are two recognized and approved methods of making such injections: First, into the veins, which is called the intravenous method; and second, under the skin, which is called the subcutaneous method. There is a third method referred to in the testimony as the 'Murphy Drip,' but it appears that this method is merely used as an auxiliary of the two principal methods of injection above mentioned. It further appears that such solutions containing a high percentage of glucose are not ordinarily injected by the subcutaneous method because of the likelihood of the sloughing of the tissue at the places where the injections are made. The doctors concluded, however, that due to the toxic condition of plaintiff the intravenous method could not be used as plaintiff's circulation was failing and such injections would overload 'the already poisoned heart'. They therefore ordered the injections containing 10 per cent glucose to be given subcutaneously. Pursuant to the doctor's directions, the injections were given subcutaneously in plaintiff's thighs by the externe at the hospital. Plaintiff's life was saved, but there was a sloughing of the tissues at the places where the injections were made. This action was brought to recover for the alleged damage sustained by reason of such sloughing.

"We will repeat here some of the testimony of the attending physicians. A portion of the testimony of Dr. McGavack was as follows: 'Q. Now, doctor, how did you determine upon the 10 per cent solution of glucose in 2 per cent saline. Will you tell us how and why that conclu-

sion was reached? A. Yes, surely. Here was a patient who was extremely toxic; here was a patient who needed fluid extremely badly; here was a patient who had a failing— almost completely failing circulation. It was necessary to give this patient nourishment. It was necessary to give this patient fluid. It was impossible to give this patient nourishment or fluid through the most readily accessible channel, that is, the veins. Within 24 seconds anything going into the veins has gone entirely through your body. It was absolutely out of the question to give it by this route, because the circulation was failing, and as I say, almost stopped. Had we done so we would have given this patient a quart or more of fluid for a failing, weakened, practically moribund heart, to pass through the circulation. Q. Moribund means what? A. Dying. It was necessary that both nourishment and fluid go in. The next most readily accessible means of absorption is by giving the fluids under the skin, and consequently we resorted to this route. We utilized the strength of the solution, as mentioned, be- cause we wanted her to have the maximum amount we could possibly put into this particular area at one time. This was followed by the third most readily accessible method of giving fluid, and that was the Murphy Drip, or the fluid per rectum. Q. Now, Doctor, at the time that you pre- scribed the 10 per cent solution for the hypodermoclysis, did you know at that time the possibility that it might cause sores. A. Yes. Q. And knowing that it might cause sores on her leg why did you do it? A. We would much rather have a chance of having our patients live than have them die with clear legs. Q. In other words, it was a case of saving her life? A. It certainly was. Q. And before you actually did it did you take consultation with Dr. Ward? A. I did. Q. And did he share your view? A. He did. Q. If the situation had not been so critical would you have used 10 per cent? A. Probably not. Q. Probably not. But it was because of the crisis? A. That is right.'

"Dr. Cookingham testified: 'Q. . . . From the condition that you found there, would you say that she was toxic? A. Very. Q. What does that mean? A. Poisoned by ab- sorptions. Q. And if, under this condition, some outside material had been put in the blood stream,—say glucose intravenously,—what effect would it have? A. It would

have overloaded the already poisoned heart and possibly have resulted seriously. Q. It has been testified in this case there was a prescription of ten per cent of glucose— 1000 centimeters—and two per cent of saline, given subcutaneously. As a medical man, in your judgment, was that good medical practice? A. It was.'

"Dr. Ward testified: 'A. The situation was one of sustaining the patient's vitality, which was very low, and she had but a single thread to hang on. Her toxemia was very great, and it was thought if we could assist her over twenty-four hours that vitality might return, and we concluded to not give any stimulation through the veins because of her weakened heart and because of the very small collapsed veins that could be seen, and she was rather stout and the tissues flabby, and she was so thoroughly dehydrated—lost so much blood by not having received or retained any that she did receive—it was thought best to use the hypodermoclysis method which is the installation of saline beneath the skin. It was accordingly decided we should give her as much glucose as her body could burn up, the intention being to sustain and overcome the toxemia by supplying her blood stream with glucose, for glucose had helped, and she needed as much help as possible, and a ten-per-cent solution was decided on,—at least we knew it was a little more than the average, yet we thought that the emergency of the hour moved us to do that. Q. Did you accomplish the purpose and save her life by the treatment? A. Yes. The possible injuries to the legs were so infinitesimal compared with the great fact of saving her life, that it was a matter of simple practice to do that. Q. You knew at the time that the ten per cent solution was given that there might be a sloughing of the legs and scars afterwards? A. Yes. It very often occurs when we use a simple saline, and sometimes it follows a simple hypodermic syringe. Q. Having in mind the condition that confronted you at the time, and having in mind the practice of medicine in San Francisco, in your opinion was the treatment administered in accord with good medical practice in San Francisco at that time? A. Yes. And it saved her life. Q. And that was what you were after? A. Absolutely.'

"We may mention the fact that not only the defendant doctors, but other medical men were called by defendants

to establish the fact that the procedure adopted by the defendant doctors in the situation which confronted them was in accordance with recognized and approved medical practice. Among those called were Dr. W. B. Coffey, surgeon of 43 years' experience and the chief surgeon for the Southern Pacific Company and other companies with 600 doctors working under his direction. He testified that under the conditions it certainly would be good medical practice to inject subcutaneously a solution containing 10 per cent glucose and would be wrong not to do it. He testified further: 'A. I frequently give it in the Southern Pacific Hospital. I have given 25 per cent in one case. I took a desperate chance, but took it and saved the life. Q. What else did it do? A. It was absorbed in this case. We do not get a breaking down in all cases. It depends on the individual and the sensitiveness of the skin. That varies. We do not know it will break down. If it does we are not a bit alarmed about it, as long as we save the life.'

"Dr. Leo Eloessor, a surgeon of 25 years' experience and professor of clinical surgery at Stanford University, testified that the defendant doctors followed the recognized medical practice under the circumstances.

"The sloughing of tissue referred to in the testimony occurred shortly after the injections were administered. Plaintiff nevertheless wrote a letter to Dr. Ward about one month later which read in part as follows: 'Dear Loved Doctor Ward:—I owe my live to your skill. This will remain with me to the end. . . . Affectionately and Ever Yours with Deepest Gratitude, N. C. Callahan.'

"This action was commenced in 1929 against all of the defendants mentioned above. In support of her claims against the defendants plaintiff produced but one medical witness, Dr. Nathan S. Housman, who first saw plaintiff in February, 1929. Dr. Housman had practiced surgery since 1921 but the testimony does not show that he had ever performed an operation in abdominal surgery or treated a case comparable to plaintiff's. Dr. Housman was on the stand on three separate occasions during the course of the trial. On the first occasion he testified that when he first saw plaintiff her limbs showed a loss of tissue and scars at the two points on her thighs. In answer to a hypothetical question he gave his opinion that this was caused by

'something wrong with your solution'; that 'there was too high a content of glucose in the solution'. At the close of plaintiff's testimony a motion for nonsuit was argued on behalf of the defendant hospital and its attendants upon the ground that the testimony merely showed that they had carried out the instructions of the defendant doctors. Plaintiff asked and was granted leave to recall Dr. Housman. He then testified that it was recognized by the medical profession in this locality that 5 per cent glucose in such solutions was the high safe limit for use subcutaneously because of the possibility of sloughing of the tissue. He further testified that in his opinion the percentage used in the present case 'was well over 10 per cent. I would imagine around 20 and maybe 50 per cent was used in the leg'. When asked how he determined this he said, 'In some cases 5 per cent up to 10 per cent have been given subcutaneously and it is a marked reaction without sloughing. That is why I determined that.' He further stated, 'There are other things that might come into this thing along with it. I did not prepare the solution or the needles. If you have a dirty needle you may get an infection causing a sloughing.' A reading of the testimony of this witness on that occasion shows that it was mainly directed at the defendants other than the defendant doctors in an attempt to prove that the sloughing was caused by the injection of a solution with a higher content of glucose than that prescribed by the doctors or that it was possibly caused by the use of a dirty needle. This witness was again recalled after the defendant doctors' motion for nonsuit had been denied and after defendants had presented their testimony. He was asked, ''Doctor, would there be any benefit to be expected from giving a person, if that person was in extreme shock and dehydrated, would there be any benefit to be expected in giving that person more than 5 per cent glucose under the skin?' He answered in the negative. He was further asked, 'If a person was actually in dire need of food, would there be anything surrounding such an extreme condition which would prohibit giving that glucose in the veins?' He again answered in the negative. It will be noted that the first question embodied only the elements of shock and dehydration while the second question embodied only the element of need of food. Neither question

covered the condition of plaintiff at the time the injections were prescribed when she was suffering not only from shock, dehydration and need of food, but was in a dying condition with failing circulation and toxemia resulting from the peritonitis.

■ "The main question before us is whether the evidence was sufficient to sustain the verdict against the defendant doctors. Appellants contend that it was not and in our opinion this contention must be sustained. The evidence with respect to respondent's condition has been set forth above. There is no evidence to show that the diagnosis made by the attending physicians was not entirely correct. The paramount duty of the doctors under the circumstances was to endeavor to save the life of the patient. There is no evidence to challenge the judgment of the doctors in determining that an injection of a solution containing 10 per cent glucose was essential to accomplish that purpose. There is no evidence to show that in the condition in which they found respondent a 10 per cent solution could have been injected in the veins without defeating that purpose. In other words, it does not appear that respondent's life could have been saved by any method of treatment other than the one prescribed by the defendant doctors. Under these circumstances, it certainly was not malpractice to save the patient's life even though this was accomplished by the subcutaneous injection of a solution containing a higher percentage of glucose than is ordinarily so injected and even though sloughing resulted at the points of injection. While appellants make the further claim that the testimony of Dr. Housman is self-destructive and inherently improbable, we deem it unnecessary to comment thereon for even when taken at its full face value we believe it is insufficient to sustain the verdict.

■ "Numerous authorities have been cited in the briefs of the parties to this appeal. It appears from these and other authorities that there are three main classes of cases in which malpractice has been charged; first, those charging unskilfulness in diagnosis; second, those charging unskilfulness in the selection of a method of treatment; and third, those charging unskilfulness in some act or omission on the part of the physician in administering the treatment. We are concerned on this appeal only with a charge of unskilfulness

on the part of appellants in the selection of the method of treatment. It is a matter of common knowledge that such selection is a matter of judgment and opinion upon which the most skilful members of the medical profession will often honestly differ. It has therefore been stated that 'A physician is required to possess only ordinary skill in his profession and to use his best judgment in the exercise of that skill, and if he complies with these requirements, he is not liable for the nonsuccess of his treatment.' (*Linn* v. *Piersol,* 37 Cal. App. 171, 173 [173 Pac. 763, 764].) This rule with certain limitations has been quite generally followed in cases involving the charge of unskilfulness in the selection of a method of treatment. (48 Cor. Jur. 1127, 1128, and cases cited; *Dahl* v. *Wagner,* 87 Wash. 492 [151 Pac. 1079]; *Dishman* v. *Northern Pac. Beneficial Assn.,* 96 Wash. 182 [164 Pac. 943]; *Loudon* v. *Scott,* 58 Mont. 645 [194 Pac. 488, 12 A. L. R. 1487]; *Luka* v. *Lowrie,* 171 Mich. 122 [136 N. W. 1106, 41 L. R. A. (N. S.) 290]; *Staloch* v. *Holm,* 100 Minn. 276 [111 N. W. 264, 9 L. R. A. (N. S.) 712]; *Delahunt* v. *Finton,* 244 Mich. 226 [221 N. W. 168]; see, also, *Markart* v. *Zeimer,* 67 Cal. App. 363, 371 [227 Pac. 683].)

 ''There is no suggestion that appellants did not possess the requisite skill nor that they did not exercise their best judgment. It is urged by respondent, however, that in the selection of the method of treatment, they were required to keep within 'recognized and approved methods'. This may be conceded but we have already pointed out that there is no evidence to show that they did not keep within recognized and approved methods under the extraordinary conditions which confronted them. The evidence offered by respondent was not related to the condition in which appellants found respondent at the time the subcutaneous injection was prescribed, and no witness for respondent stated what was the recognized or approved method *for the treatment of that condition.* . . .

 ''Counsel for respondent claims that there is a conflict in the evidence relating to respondent's condition at the time in question. The only evidence referred to is that of lay witnesses. We find no material conflict in this evidence but in any event the testimony of the expert witnesses was conclusive on this subject. (*Johnson* v. *Clarke,* 98 Cal. App. 358 [276 Pac. 1052].) Respondent makes

the further point that Dr. Housman testified that there was no condition of a patient which would justify the subcutaneous injection of a solution containing more than 5 per cent glucose. We have above indicated that Dr. Housman's testimony was general in its nature and was not related to the condition of the patient at the time in question. He did not dispute the conclusion of appellants that an injection of a solution containing 10 per cent glucose was essential to save respondent's life nor did he dispute the conclusion of appellants that the intravenous injection of such a solution *in a patient in respondent's condition* would have endangered her life. It is therefore apparent that his testimony was inadequate to show what was the recognized and approved method to be selected *for the treatment of respondent's condition* or to show that appellants had in any manner violated any duty owing to respondent.

"Appellants raise numerous other points relating to the pleadings, the amount of damages awarded, the rulings on instructions and other rulings of the trial court. The conclusions which we reached make it unnecessary to discuss these questions. When the cause was submitted to the jury, the trial court should have directed a verdict in favor of appellants and we believe that the trial court should now be directed to enter judgment in their favor."

The judgment is reversed with directions to the trial court to enter judgment in favor of appellants.

Rehearing denied.

Spence, J., *pro tem.,* being disqualified, did not participate.