No. 41,476

Irma Natanson, *Appellant*, v. John R. Kline and St. Francis
Hospital and School of Nursing, Inc., *Appellees.*

(350 P. 2d 1093)

Opinion filed April 9, 1960.

*Wayne Coulson,* of Wichita, argued the cause, and *Homer V. Gooing, Paul
R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Gerritt H. Worm-
houdt, Philip Kassebaum, John E. Rees, Robert T. Cornwell* and *Willard B.*

*Thompson,* all of Wichita, were with him on the briefs for the appellant; *Hugo T. Wedell,* of Wichita, of counsel.

*William Tinker,* of Wichita, argued the cause, and *Getto McDonald, Arthur W. Skaer, Hugh P. Quinn, William Porter, Alvin D. Herrington, Darrell D. Kellogg, Richard T. Foster, W. D. Jochems, J. Wirth Sargent, Emmett A. Blaes, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkle, John W. Brimer* and *Harry L. Hobson,* all of Wichita, were with him on the briefs for the appellee, St. Francis Hospital and School of Nursing, Inc.

*W. A. Kahrs,* of Wichita, argued the cause, and *Robert H. Nelson* and *H. W. Fanning,* both of Wichita, were with him on the briefs for the appellee, John R. Kline.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for malpractice against a hospital and the physician in charge of its radiology department to recover for injuries sustained as the result of radiation therapy with radioactive cobalt, alleged to have been given in an excessive amount.

The plaintiff (appellant), Irma Natanson, suffering from a cancer of the breast, had a radical left mastectomy performed on May 29, 1955. At the direction of Dr. Crumpacker, the surgeon who performed that operation, the plaintiff engaged Dr. John R. Kline, a radiologist, for radiation therapy to the site of the mastectomy and the surrounding areas.

Dr. Kline, a licensed physician and specialist in radiation therapy, was head of the radiology department at St. Francis Hospital at Wichita, Kansas. The plaintiff seeks damages for injuries claimed to have been sustained as a result of alleged acts of negligence in the administration of the cobalt radiation treatment. Dr. Kline and the hospital were named as defendants (appellees).

The case was tried to a jury which returned a verdict in favor of both defendants. The plaintiff's motion for a new trial having been denied, this appeal followed specifying various trial errors.

The questions controlling the decision herein relate to the giving of instructions by the trial court.

It will be unnecessary to relate in detail all the facts presented by the evidence as abstracted, consisting of more than three hundred pages, to dispose of the issues on appeal.

The jury was submitted two special questions. In the first it found that the defendants were not guilty of any act or acts of negligence which were the proximate cause of plaintiff's injury.

The jury having found in the negative on the first, the second question required no answer.

It must be conceded, insofar as the evidence is concerned, that all presumptions are, and must be, in favor of the verdict. All issues of fact have been resolved in favor of the defendants. (*Lord v. Hercules Powder Co.*, 161 Kan. 268, 167 P. 2d 299; and *Beye v. Andres*, 179 Kan. 502, 296 P. 2d 1049.)

The appellant contends, however, the uncontradicted evidence shows the defendants negligent as a matter of law.

Dr. Kline was called by the plaintiff to testify in the trial court and in great detail counsel examined Dr. Kline to educate the court and jury concerning cobalt radiation therapy in the treatment of cancer. A short summary in rough will serve as a basis for further discussion.

The purpose of any irradiation therapy is to destroy tissue. The theory of destruction of cancer by irradiation therapy is that when treatment is given in a series of doses (fractionation in medical terms), the greater ability of normal tissue to recover from irradiation effects enables it to survive while the cancerous tissue is destroyed.

Dosages of irradiation are expressed in roentgen. All forms of irradiation have some point of maximum, or one hundred per cent, dosage and diminish as they penetrate deeper into the body. In the case of X rays the point of maximum dosage is in the skin. In the case of cobalt irradiation the maximum dosage is received at a point about five millimeters beneath the outer surface of the skin. The primary advantages of cobalt irradiation over X ray irradiation are deeper penetration and less skin injury. The amount of X ray which can be administered is governed in a large measure by the amount which the skin can tolerate. The amount of cobalt irradiation which can be administered is governed by the tolerance of the tissues lying five millimeters below the outer surface of the skin.

By "equilibrium" dose in relation to radioactive cobalt is meant the maximum dose, which occurs about five millimeters below the outer surface of the skin. "Tumor" dose means the quantity received at the known or assumed depth of the tumor.

Dr. Kline ordered the administration of cobalt irradiation for the appellant in "routine fashion." To him and to his assistant, Dr. Somers, this meant a tumor dose of 4,400 roentgen delivered to the supraclavicular area in a period of sixteen days. For this purpose

the tumor was assumed to extend from outer surface in front to outer surface behind. "Routine fashion" also meant a dosage of 4,800 roentgen delivered over the outer two centimeters of the remainder of the left chest from a point at the rear portion of the left side of the patient's body around past the breast bone in a period of twenty-three days. It also meant an approximately equal dosage to the outer two centimeters over the breast bone including the chain of lymph nodes running longitudinally along each side of the breast bone.

Material to further discussion is the fact that the prescription or outline of treatment called for 4,800 roentgen to be delivered to the outer two centimeters of the chest wall. It also directed that this treatment be delivered by means of a rotating beam. According to the testimony of the appellant's husband the rotational equipment had not been installed and ready for use at the time of the appellant's first treatment. It was installed and ready for use soon thereafter.

A radiologist, who administers cobalt irradiation treatment with rotational equipment, must have the assistance of a specialist in physics. Dr. Kline's assistant was a hospital employee by the name of Darter who determined by necessary computations how to administer the desired quantity of radiation, ordered by Dr. Kline, by means of a moving beam. Darter had graduated from Wichita University with a B. S. degree the preceding spring and had a six months' special course on irradiation therapy at Massachusetts Institute of Technology. His actual experience with radioactive cobalt therapy began with the installation of the unit at the St. Francis Hospital on January 29, 1955, some four months before the appellant's treatment began.

Highly summarized, the evidence upon which the appellant relies is that the radioactive cobalt beam was delivered at an angle to the chest wall in an effort to avoid injury to the lungs. In making the calculations to achieve the tumor doses (one and one-half to two centimeters deep), the equilibrium doses (five millimeters deep) were not calculated by Darter.

Dr. Paul A. Roys, an assistant professor of physics at Wichita University, who was a specialist in the field of nuclear physics of which radiation physics is a part, was called to testify concerning his calculations of the roentgen delivered to various parts of the appellant's chest wall in accordance with the time chart and dosages

administered to the appellant as a result of Darter's calculations. From Dr. Roys' calculations the equilibrium doses administered at several segments of the chest wall were from 5,670 roentgen to 6,260 roentgen at a depth of five millimeters. It was in these segments where the appellant's injuries were sustained.

Dr. Kline had previously testified that the soft tissues of the chest wall could tolerate about 5,000 roentgen in twenty-four or twenty-five days; that the cartilage could tolerate about 5,500 roentgen over a period of twenty-eight days, and ordinarily bone would stand a larger amount. The appellant argues the effect upon her of the administration of amounts ranging from 5,670 roentgen to 6,280 roentgen certainly corroborates Dr. Kline's testimony. The entire chest, skin, cartilage and bone were completely destroyed in those areas.

There was other evidence which contradicted the appellant's theory, however. When Dr. Kline was called as a witness on his own behalf, he stated the prescribed dosage of 4,400 roentgen was intended as a minimum dosage, and was the smallest dosage which would be effective and had to be given, even though he knew that portions of the chest would receive a much higher dosage. He testified that a doctor has to take a chance in the treatment of cancer, that he knew there was danger of injury from such treatment, but that he took a calculated risk. This risk is determined to a large extent by the tolerance of the individual concerned. Some patients have a much higher tolerance than others. He further testified that he had treated approximately seventy-five breast and cancer cases since the treatment of the appellant, all of which were treated in the same manner with the same number of roentgens directed to be given.

Dr. Hare, a radiologist from Los Angeles, was called to testify for the appellees. He said that for five years he had been using 6,000 roentgen up to 9,000 roentgen on the treatment of cancer cases.

At the time treatment started the appellant had an ulcer about the size of a quarter under her left arm which remained from the mastectomy. It had not stopped draining. After treatment started the drainage increased and, according to the appellant, she understood the treatment was to shrink the area but instead it seemed to be growing larger.

There is no issue presented by the record as to the relationship

between Dr. Kline and the St. Francis Hospital. The petition pleaded that the defendants were engaged in a joint adventure or in the alternative that the defendant physician was acting within the scope of his employment as agent, servant and employee of the defendant hospital. The answer of the defendant hospital admitted that the defendant physician "was in charge of its radiology department." Moreover, the pleadings raised no issues between the defendants.

Upon the foregoing evidence on the state of the record presented herein, it cannot be said the appellees were guilty of negligence as a matter of law. At best it may be said, upon all the facts and circumstances presented by the record, there was evidence from which a jury could find that the proximate cause of the appellant's injury was the negligence of the defendants. On the other hand a jury, *properly instructed,* would be justified in finding for the appellees.

We shall next consider whether the jury was properly instructed.

The code of civil procedure requires the court to give general instructions to the jury, with or without request having been made for the same. (G. S. 1949, 60-2909, *Fifth.*) This provision has frequently been interpreted to require the court to define the issues and state at least generally the law applicable thereto. (*Bushey v. Coffman,* 109 Kan. 652, 201 Pac. 1103; *Knox v. Barnard,* 181 Kan. 943, 317 P. 2d 452; and *Schmid v. Eslick,* 181 Kan. 997, 317 P. 2d 459.) The trial court in summarizing the pleadings for the jury in its instructions was quite brief. Aside from general factual recitations the material portions of this summarization given in instruction No. 1 are as follows:

"In this case the plaintiff Irma Natanson . . . alleges . . . *that Dr. Kline and personnel of St. Francis Hospital administered to the plaintiff a series of cobalt radiation treatments in such a negligent manner* that the skin, flesh and muscles beneath her left arm sloughed away and ribs of her left chest were so burned that they became necrotic, or dead; . . .

"The defendants then filed their answers in the case in which they allege that the treatments were properly administered and that they were not guilty of any negligence toward the plaintiff." (Emphasis added.)

Then followed the usual instruction (No. 2) that the foregoing statement taken from the pleadings set forth the various claims and contentions of the parties against each other, and that such claims and contentions are to be considered only as they may have been proved by evidence presented during the trial of the case.

Instruction No. 3 reads in part:

"This is a lawsuit based upon negligence. In the conduct of human affairs, the law imposes upon us the obligation to use due and proper care to avoid hurt or injury to others. Thus, negligence may be defined as a violation of the duty to use due and proper care. The term, 'due and proper care' means, in this case, such care as medical specialists in radiology in this community would ordinarily and reasonably use under the same or similar circumstances."

The court then instructed that negligence is never presumed—it must be proved by a preponderance or greater weight of the evidence; it defined preponderance or greater weight of the evidence and instructed that negligence may be established by circumstantial evidence.

Instruction No. 4 given by the court reads:

"The law does not require that treatments given by a physician to a patient shall attain nearly perfect results. He is not responsible in damages for lack of success or honest mistakes or errors of judgment unless it be shown that he did not possess that degree of learning and skill ordinarily possessed by radiologists of good standing in his community, or that he was not exercising reasonable and ordinary care in applying such skill and learning to the treatment of the patient. And if among radiologists more than one method of treatment is recognized, it would not be negligence for the physician to have adopted any of such methods if the method he did adopt was a recognized and approved method in the profession at the time and place of treatment."

On this appeal the court is not concerned with the general instructions on negligence or instruction No. 4, which correctly states the law. The cases upon which the appellees rely to substantiate these instructions are sound law. (*Erastus Tefft v. Hardin H. Wilcox*, 6 Kan. 46; *Sly v. Powell*, 87 Kan. 142, 123 Pac. 881; *Paulich v. Nipple*, 104 Kan. 801, 180 Pac. 771; *James v. Grigsby*, 114 Kan. 627, 220 Pac. 267; *Riggs v. Gouldner*, 150 Kan. 727, 96 P. 2d 694; *Cummins v. Donley*, 173 Kan. 463, 249 P. 2d 695; and *Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636.)

The amended petition pleaded negligence in eight specific particulars, one or more of which presented issues which the jury was required to determine on the basis of the evidence presented. It was proper for the trial court to exclude those specific allegations of negligence enumerated in the amended petition concerning which there was no evidence, but it should have set forth those specific allegations of negligence concerning which there was evidence. The general summarization, consisting of the italicized

portion of instruction No. 1 heretofore quoted, was insufficient to meet this obligation of the trial court.

The answers filed by both of the defendants in the lower court denied the specific allegations of negligence alleged in the amended petition and pleaded "the plaintiff assumed the risk and hazard of said treatment."

One of the alleged grounds of negligence, concerning which there was evidence before the jury, was that Dr. Kline failed to warn the appellant the course of treatment which he undertook to administer involved great risk of bodily injury or death.

The appellant requested and the trial court refused to give the following instruction:

"You are instructed that the relationship between physician and patient is a fiduciary one. The relationship requires the physician to make a full disclosure to the patient of all matters within his knowledge affecting the interests of the patient. Included within the matters which the physician must advise the patient are the nature of the proposed treatment and any hazards of the proposed treatment which are known to the physician. Every adult person has the right to determine for himself or herself whether or not he will subject his body to hazards of any particular medical treatment.

"You are instructed that if you find from the evidence that defendant Kline knew that the treatment he proposed to administer to plaintiff involved hazard or danger he was under a duty to advise plaintiff of that fact and if you further find that defendant Kline did not advise plaintiff of such hazards then defendant Kline was guilty of negligence."

There was evidence from which the jury could have found that the appellant fully appreciated the danger and the risk of the radiation treatment. The appellant's husband testified:

"Q. Yes, how did it happen you went there for the conference with Dr. Kline?

"A. We, of course, made a periodic visit to Dr. Crumpacker after the operation, and he told us that as a precautionary measure Mrs. Natanson should go to the St. Francis Hospital and take the cobalt treatment. He explained to us that the cobalt was a new therapy; that it was much more powerful than the x-ray they had used previously. He suggested we see Dr. Kline."

On cross examination he testified:

"Q. Just a question or two. Mr. Natanson, when you and your wife went to see Dr. Crumpacker, did you have a discussion with him about the purpose of the irradiation?

"A. Yes.

"Q. And, was the general objection of irradiation explained to you?

"A. Yes.

"Q. And, that was when Mrs. Natanson was with you?

"A. Yes.

"Q. Now, did you consult any radiologist other than Dr. Kline in determining anything about this irradiation?

"A. No, sir.

. . . . . . . . . . . . . .

"Q. Now, I take it that it was Dr. Crumpacker's thought or suggestion at least to you that Dr. Kline be consulted?

"A. Yes.

"Q. And, up to the time you engaged Dr. Kline, Dr. Crumpacker had been the doctor on the case?

"A. Yes."

There was also testimony from the appellant and her husband that Dr. Kline did not inform the appellant the treatment involved any danger whatever. The testimony of Dr. Kline, a radiologist with special training in cobalt irradiation, was that he knew he was "taking a chance" with the treatment he proposed to administer and that such treatment involved a "calculated risk." He testified there was always a danger of injury in the treatment of cancer. Insofar as the record discloses Dr. Kline did not testify that he informed the appellant the treatment involved any danger. His only testimony relevant thereto was the following:

"Q. Now, tell us what transpired when you first met with the Natansons?

"A. I could not completely recall that meeting. It was such a long time ago.

"Q. Just tell us what you can recall of it?

"A. I remember Mr. and Mrs. Natanson coming in to see me. I can't remember if I met them in my office or whether we were downstairs. I remember in a very vague way. I remember in a vague way that we discussed the treatment, about how long it took, the number of areas we would irradiate. I have a recollection of that. I remember we took her into the treatment room. She was marked out, measured. I believe the marking out and measurement was done by Mr. Darter. Her first treatment occurred the first day she came. I am not sure of that but I think so.

"Q. Have you told us everything you recall?

"A. Yes."

No other evidence appears in the record concerning the subject.

The appellees argue that we are here concerned with a case where the patient consented to the treatment, but afterwards alleges that the nature and consequences of the risks of the treatment were not properly explained to her. They point out this is not an action for assault and battery, where a patient has given no consent to the treatment.

What appears to distinguish the case of the unauthorized surgery

or treatment from traditional assault and battery cases is the fact that in almost all of the cases the physician is acting in relatively good faith for the benefit of the patient. While it is true that in some cases the results are not in fact beneficial to a patient, the courts have repeatedly stated that doctors are not insurers. The traditional assault and battery involves a defendant who is acting for the most part out of malice or in a manner generally considered as "antisocial." One who commits an assault and battery is not seeking to confer any benefit upon the one assaulted.

The fundamental distinction between assault and battery on the one hand, and negligence such as would constitute malpractice, on the other, is that the former is intentional and the latter unintentional. (*Hershey v. Peake,* 115 Kan. 562, 223 Pac. 1113; and *Maddox v. Neptune,* 175 Kan. 465, 264 P. 2d 1073.)

We are here concerned with a case where the patient consented to the treatment, but alleges in a malpractice action that the nature and consequences of the risks of the treatment were not properly explained to her. This relates directly to the question whether the physician has obtained the informed consent of the patient to render the treatment administered.

The treatment of a cancer patient with radioactive cobalt is relatively new. Until the use of atomic energy appeared in this country, X ray was the type of radiation treatment used for such patients. Radioactive cobalt is manufactured by the Atomic Energy Commission in a neutron pill by bombarding the stable element of cobalt in its pure state. This makes the cobalt unstable and by reason thereof it is radioactive. The radioactive cobalt emits two homogeneous beams of pure energy called gamma rays, very close in character, which are far more powerful than the ordinary X rays. It produces no other rays to be filtered out. This makes it desirable for use in the treatment of cancer patients. The cobalt machine may be compared to a three million volt X ray machine.

Radioactive cobalt is so powerful that the Atomic Energy Commission specifies the construction of the room in which the cobalt unit is to be placed. The walls of the room are made of concrete forty inches thick and the ceiling, also concrete, is twenty-four inches thick. The room is sunken down in a courtyard outside the hospital. A passageway off the control room about ten feet long leads to the treatment room. All controls are placed in the outer control room and, when the radiation treatment is administered to a patient, the

operator in the outer room looks through a specially designed thick lead quartz glass which gives a telescopic view. A periodic report of radiation outside the room must be made to the Atomic Energy Commission in accordance with regulations. These facts were given by Dr. Kline in his testimony.

These facts are not commonly known and a patient cannot be expected to know the hazards or the danger of radiation from radioactive cobalt unless the patient is informed by a radiologist who knows the dangers of injury from cobalt irradiation. While Dr. Kline did not testify that the radiation he gave the appellant caused her injury, he did state cobalt irradiation could cause the injury which the appellant did sustain.

What is the extent of a physician's duty to confide in his patient where the physician suggests or recommends a particular method of treatment? What duty is there upon him to explain the nature and probable consequences of that treatment to the patient? To what extent should he disclose the existence and nature of the risks inherent in the treatment?

We have been cited to no Kansas cases, nor has our research disclosed any, dealing directly with the foregoing questions. A recent article by William A. Kelly published in the Kansas Law Review entitled "The Physician, The Patient, And The Consent" (8 Kan. L. Rev. 405), reviews many malpractice cases dealing with the consent of the patient, but the article fails to deal with the problem of disclosure involving on one hand the right of the patient to decide for himself and on the other a possible therapeutic ground for withholding information which may create tension by depressing or exciting the patient. This subject has been touched upon in an article by Charles C. Lund, M. D., "The Doctor, The Patient, And The Truth" (19 Tenn. L. Rev. 344 [1946]), and in an article by Hubert Winston Smith, LL. B., M. D., "Therapeutic Privilege To Withhold Specific Diagnosis From Patient Sick With Serious Or Fatal Illness" (19 Tenn. L. Rev. 349 [1946]). Allan H. McCoid, Associate Professor of Law, University of Minnesota, has written two recent articles, one "A Reappraisal Of Liability For Unauthorized Medical Treatment" (41 Minn. L. Rev. 381), published in March, 1957, and the other "The Care Required Of Medical Practitioners" (12 Vanderbilt L. Rev. 549, 586), published in June, 1959.

The courts frequently state that the relation between the physi-

cian and his patient is a fiduciary one, and therefore the physician has an obligation to make a full and frank disclosure to the patient of all pertinent facts related to his illness. We are here concerned with a case where the physician is charged with treating the patient without consent on the ground the patient was not fully informed of the nature of the treatment or its consequences, and, therefore, any "consent" obtained was ineffective. An effort will be made to review the cases from foreign jurisdictions most nearly in point with the question presently at hand, although none may be said to be directly in point.

In 1958 the Supreme Court of Minnesota in *Bang v. Charles T. Miller Hospital,* 251 Minn. 427, 88 N. W. 2d 186, had an assault case before it, and though not alleged as a malpractice action for negligence, a new trial was granted on the ground that a fact issue was presented for the jury to determine whether the patient consented to the performance of the operation. There the patient went to a urologist because of urinary trouble and apparently consented to a cystoscopic examination and a prostate operation. He was not informed that part of the procedure of a transurethral prostatic resection would be the tying off of his sperm ducts. In the opinion the court said:

"While we have no desire to hamper the medical profession in the outstanding progress it has made and continues to make in connection with the study and solution of health and disease problems, it is our opinion that a reasonable rule is that, where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be informed of the alternative possibilities and given a chance to decide before the doctor proceeds with the operation. By that we mean that, in a situation such as the case before us where no immediate emergency exists, a patient should be informed before the operation that if his spermatic cords were severed it would result in his sterilization, but on the other hand if this were not done there would be a possibility of an infection which could result in serious consequences. Under such conditions the patient would at least have the opportunity of deciding whether he wanted to take the chance of a possible infection if the operation was performed in one manner or to become sterile if performed in another." (pp. 434, 435.)

A malpractice action was before the Fifth Circuit Court in *Lester v. Aetna Casualty & Surety Company,* 240 F. 2d 676. The patient was given electro-shock treatments prescribed by a psychiatrist and suffered a bad result. In affirming the jury's finding the

court held the patient's wife gave sufficient legal consent, and said:

"The basic, the fundamental, difficulty which confronts plaintiff on this appeal is that he presents his case as though it were one of a person being deprived by another of due process of law, instead of grounding it upon the well settled principles that a physician must, except in real and serious emergencies, acquaint the patient or, when the circumstances require it, some one properly acting for him, of the diagnosis and the treatment proposed, and obtain consent, thereto express or implied, and, consent obtained must proceed in accordance with proper reasonable medical standards *and in the exercise of due care* . . ." (p. 679.) (Emphasis added.)

The appellees rely upon the Canadian case of *Kenny v. Lockwood* [1932], 1 D. L. R. 507, where a patient alleged the defendants falsely and recklessly, without caring whether it was true or false, and without reasonable ground for believing it to be true, represented the operation to be "simple," and that her hand "would be all right in three weeks." No evidence was presented to suggest fraud or recklessness and the plaintiff's argument proceeded mainly upon the duty which it was said the defendants owed to the plaintiff, due to the peculiar relation set up between a surgeon and his patient. The Ontario trial judge concluded that it was the duty of the defendant doctors to "enlighten the patient's mind in a plain and reasonable way as to what her ailment was, as to what were the risks of operating promptly, what were the risks of delaying the operation, and what the risks of not operating at all. Having discharged that duty, it was their further duty to secure from the patient a decision or consent as to what course is to be followed, and if that decision or consent is not had and the surgeons operate and the operation turns out badly the surgeons are liable. Such a relationship is established between a person of special skill and knowledge and a person of no skill or knowledge upon the facts required for the making of a decision that, unless the person with the special skill and knowledge discharges the duty which he owes of placing the patient in a position to make a decision, that person, when he is employed and paid because of his special skill and knowledge, has failed to perform his duty, and that breach of duty makes him liable in damages for untoward results." (*Kenny v. Lockwood Clinic Ltd.* [1931], 4 D. L. R. 906, 907.)

The trial court found for the plaintiff but on appeal the judgment was reversed, the appellate court saying there was some testimony

that the doctors had explained all details to the plaintiff, although the extracts contained in the opinion indicate that the doctor admitted to having said that the operation was not a very serious one and that he had not clearly presented the alternatives to the plaintiff. In the court's opinion it was said:

". . . the duty cast upon the surgeon was to deal honestly with the patient as to the necessity, character and importance of the operation and its probable consequences and whether success might reasonably be expected to ameliorate or remove the trouble, but that such duty does not extend to warning the patient of the dangers incident to, or possible in, any operation, nor to details calculated to frighten or distress the patient." (p. 525.)

The court concluded upon the evidence presented:

"That the defendant Stoddart reasonably fulfilled the duty laid upon him arising out of the relationship of surgeon and patient, not being guilty of 'negligence in word' or 'economy of truth' nor of misleading the plaintiff, and so is not liable for breach of the duty . . ." (p. 526.)

In the opinion it was said the duty of a surgeon is to be honest in fact and to express his honest belief, and if he does so he ought not to be judged as if he had warranted a perfect cure nor to be found derelict in his duty on any meticulous criticism of his language.

The conclusion to be drawn from the foregoing cases is that where the physician or surgeon has affirmatively misrepresented the nature of the operation or has failed to point out the probable consequences of the course of treatment, he may be subjected to a claim of unauthorized treatment. But this does not mean that a doctor is under an obligation to describe in detail all of the possible consequences of treatment. It might be argued, as indicated by the authors of the various law review articles heretofore cited, that to make a complete disclosure of all facts, diagnoses and alternatives or possibilities which may occur to the doctor could so alarm the patient that it would, in fact, constitute bad medical practice. There is probably a privilege, on therapeutic grounds, to withhold the specific diagnosis where the disclosure of cancer or some other dread disease would seriously jeopardize the recovery of an unstable, temperamental or severely depressed patient. But in the ordinary case there would appear to be no such warrant for suppressing facts and the physician should make a substantial disclosure to the patient prior to the treatment or risk liability in tort.

Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, ex-

pressly prohibit the performance of life-saving surgery, or other medical treatment. A doctor might well believe that an operation or form of treatment is desirable or necessary but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception.

The mean between the two extremes of absolute silence on the part of the physician relative to the treatment of a patient and exhaustive discussion by the physician explaining in detail all possible risks and dangers was well stated by the California District Court of Appeal in *Salgo v. Leland Stanford, Etc. Bd. Trustees* [1957], 154 Cal. App. 2d 560, 317 P. 2d 170. There the court had before it a malpractice action wherein the defendants were charged with *negligence*. The patient, his wife and son testified that the patient was not informed anything in the nature of an aortography was to be performed. Two of the doctors contradicted this, although admitting that the details of the procedure involving injection of a radio-opaque substance into the aorta and the possible dangers therefrom were not explained. As a result of the aortography the patient was paralyzed from the waist down. The trial court gave a rather broad instruction on the duty of the physician to disclose to the patient "all the facts which mutually affect his rights and interests and of the surgical risk, hazard and danger, if any." (p. 578.) On appeal, the instruction was held to be overly broad, the court stating:

". . . A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent . . .

"The instruction given should be modified to inform the jury that the physician has such discretion consistent, of course, with the full disclosure of facts necessary to an informed consent." (p. 578.)

The appellees rely upon *Hunt v. Bradshaw* [1955], 242 N. C. 517, 88 S. E. 2d 762, a North Carolina case. This was a malpractice action against a physician wherein the patient sought damages alleged to have resulted from the negligent failure of the defendant (1) to use reasonable care and diligence in the application of his knowledge and skill as a physician and surgeon, and (2) to exercise his best judgment in attempting to remove a small piece of steel from plaintiff's body. On these allegations of negligence the plaintiff contended, among other things, that the defendant advised the plaintiff the operation was simple, whereas it was serious and involved undisclosed risks. The plaintiff's evidence was sufficient to justify a finding the operation was of a very serious nature. The court after reviewing the evidence said:

". . . Upon Dr. Bradshaw's advice the operation was decided upon. It is understandable the surgeon wanted to reassure the patient so that he would not go to the operating room unduly apprehensive. Failure to explain the risks involved, therefore, may be considered a mistake on the part of the surgeon, *but under the facts* cannot be deemed such want of ordinary care as to import liability.

"Proof of what is in accord with approved surgical procedure and what constitutes the standard of care required of the surgeon in performing an operation, like the advisability of the operation itself, are matters not within the knowledge of lay witnesses but must be established by the testimony of qualified experts . . .

"Plaintiff's expert testimony is sufficient to justify the finding the injury and damage to plaintiff's hand and arm resulted from the operation. But, as in cases of ordinary negligence, the fact that injury results is not proof the act which caused it was a negligent act. The doctrine *res ipsa loquitur* does not apply in cases of this character . . .

"Of course, it seems hard to the patient in apparent good health that he should be advised to undergo an operation, and upon regaining consciousness finds that he has lost the use of an arm for the remainder of his life. Infallibility in human beings is not attainable. The law recognizes, and we think properly so, that the surgeon's hand, with its skill and training, is, after all, a human hand, guided by a human brain in a procedure in which the margin between safety and danger sometimes measures little more than the thickness of a sheet of paper.

"The plaintiff's case fails because of lack of expert testimony that the defendant failed, either to exercise due care in the operation, or to use his best judgment in advising it . . ." (pp. 523, 524.) (Emphasis added.)

Under *the facts* presented by the case it does not appear the allegations of negligence were sufficient to encompass the failure of the physician to inform the patient of the risks.

An X ray case upon which the appellees rely is *Costa v. Regents*

*of Univ. of California,* 116 Cal. App. 2d 445, 254 P. 2d 85. This was a malpractice action against a hospital and certain doctors for alleged negligence in the X ray treatment of cancer to the area of the lower jaw which resulted in necrosis of tissue. It was alleged the X ray treatment was too drastic and extensive. While the circumstances were in many respects similar to the case at bar, it did not involve any failure of the physicians to disclose the risks. It was claimed a less drastic and extensive treatment should have been undertaken by the doctors. The court said:

". . . The expert evidence showed clearly that the exact extent of the cancer under the surface and the absence of hidden involvements cannot in a case like appellant's be decided with such certainty that it can be safely relied on for the purpose of restricting the treatment within narrow limits. There was no expert evidence whatever that on the data available to defendants they ought in good practice to have restricted the X-ray treatment to a less drastic procedure or that the diagnostic methods now indicated by appellant if used would have yielded certainty and should have led to restriction to less dangerous treatment. Several experts testified that said methods (X-ray pictures and biopsy) could not be relied on for the purpose. In fighting so dangerous a condition as here involved, physicians may take serious risks and in doing so must rely on their judgment in deciding how far to go. See *Callahan v. Hahnemann Hospital,* 1 Cal. 2d 447 [35 P. 2d 536]. To hold them responsible in the cases where the bad chance unfortunately materializes would be evidently unjust and most dangerous if physicians were deterred from going to the extent which gives their patient the best chance of survival." (p. 457.)

The *Costa* case has nothing to do with the duty to inform the patient of the hazardous character of proposed treatment. The more recent case of the same court in *Salgo v. Leland Stanford, Etc. Bd. Trustees,* supra, covers the subject specifically.

In our opinion the proper rule of law to determine whether a patient has given an intelligent consent to a proposed form of treatment by a physician was stated and applied in *Salgo v. Leland Stanford, Etc. Bd. Trustees,* supra. This rule in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question if it appears, all circumstances con-

sidered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation.

Turning now to the facts in the instant case, the appellant knew she had a cancerous tumor in her left breast which was removed by a radical mastectomy. Pathological examination of the tissue removed did not disclose any spread of the cancer cells into the lymphatics beyond the cancerous tumor itself. As a precautionary measure the appellant's ovaries and fallopian tubes were removed, which likewise upon pathological examination indicated no spread of the cancer to these organs. At the time the appellant went to Dr. Kline as a patient there was no immediate emergency concerning the administration of cobalt irradiation treatment such as would excuse the physician from making a reasonable disclosure to the patient. We think upon all the facts and circumstances here presented Dr. Kline was obligated to make a reasonable disclosure to the appellant of the nature and probable consequences of the suggested or recommended cobalt irradiation treatment, and he was also obligated to make a reasonable disclosure of the dangers within his knowledge which were incident to, or possible in, the treatment he proposed to administer.

Upon the record here presented Dr. Kline made no disclosures to the appellant whatever. He was silent. This is not to say that the facts compel a verdict for the appellant. Under the rule heretofore stated, where the patient fully appreciates the danger involved, the failure of a physician in his duty to make a reasonable disclosure to the patient would have no causal relation to the injury. In such event the consent of the patient to the proposed treatment is an informed consent. The burden of proof rests throughout the trial of the case upon the patient who seeks to recover in a malpractice action for her injury.

In considering the obligation of a physician to disclose and explain to the patient in language as simple as necessary the nature of the ailment, the nature of the proposed treatment, the probability of success or of alternatives, and perhaps the risks of unfortunate results and unforeseen conditions within the body, we do not think the administration of such an obligation, by imposing liability for malpractice if the treatment were administered without such explanation where explanation could reasonably be made, presents any insurmountable obstacles.

The appellant's requested instruction on the duty of a physician to make a disclosure to his patient was too broad. But this did not relieve the trial court of its obligation to instruct on such issue under the circumstances here presented, since the issue was raised by the pleadings. On retrial the instruction should be modified to inform the jury that a physician has such discretion, as heretofore indicated, consistent with the full disclosure of facts necessary to assure an informed consent by the patient.

On retrial of this case the first issue for the jury to determine should be whether the administration of cobalt irradiation treatment was given with the informed consent of the patient, and if it was not, the physician who failed in his legal obligation is guilty of malpractice no matter how skillfully the treatment may have been administered, and the jury should determine the damages arising from the cobalt irradiation treatment. If the jury should find an informed consent was given by the patient for such treatment, the jury should next determine whether proper skill was used in administering the treatment.

The primary basis of liability in a malpractice action is the deviation from the standard of conduct of a reasonable and prudent medical doctor of the same school of practice as the defendant under similar circumstances. Under such standard the patient is properly protected by the medical profession's own recognition of its obligations to maintain its standards.

The appellant requested and the trial court refused to give the following instruction:

"You are instructed that under the terms of the contract between defendant Kline and defendant Hospital it was the duty of defendant Kline to supervise the work of all the personnel in the radiology department. If you find that plaintiff's injury was the result of the negligence of personnel in the department your verdict shall be in favor of plaintiff and against both defendants."

Nowhere in the written instructions was there anything to indicate that either defendant could be chargeable with the negligence of anyone other than the negligence of Dr. Kline personally, unless it is to be construed from the generalization of the pleadings contained in the court's instruction No. 1. This generalization at best would be confusing to a jury on this point.

"A physician is responsible for an injury done to a patient through the want of proper skill and care in his assistant, and through the want of proper skill and care in his apprentice, agent, or employee. The fact that a physician's assistant is a member of the same or a similar profession does not make the

rule of *respondeat superior* inapplicable, and a physician is liable not only for negligence of laymen employed by him, but also for the negligence of nurses or other physicians in his employ.

. . . . . . . . . . . . . . .

"Corporations, or persons other than physicians, who treat patients for hire with the expectation of profit are liable for negligence or malpractice on the part of the physicians or nurses employed by them." (70 C. J. S., Physicians and Surgeons, § 54e, pp. 978, 979, and see cases cited therein.)

Although the court did not think it necessary to go into the doctrine of *respondeat superior*, see the facts in *Rule v. Cheeseman, Executrix,* 181 Kan. 957, 317 P. 2d 472.

In *Gray v. McLaughlin,* 207 Ark. 191, 179 S. W. 2d 686, an X-ray specialist or roentgenologist was held liable for injuries caused by the X-ray technician employed by him.

In an action for damages founded on malpractice it is the duty of the trial court to instruct the jury with respect to the law governing the case, explaining the precise questions at issue. This includes, under the evidence presented by the record in the instant case, the responsibility of the physician for the acts or omissions of others under his supervision. (See, 70 C. J. S., Physicians and Surgeons, § 64, p. 1016, and cases cited.)

A party is entitled to have the trial court give an instruction to the jury which is essential to his theory of the case when there is sufficient evidence to support such theory. (*Kreh v. Trinkle,* 185 Kan. 329, 343 P. 2d 213.)

In our opinion the refusal of the trial court to give the requested instruction was prejudicial and constituted reversible error. It was Dr. Somers, not Dr. Kline, who prescribed use of rotational therapy. Dr. Somers was an assistant to Dr. Kline. It was the hospital's employee, Darter, referred to by Dr. Kline as his physicist, who made the computations which resulted in administration of a dosage in excess of tolerance limits, if the jury were to give credence to the appellant's theory of the evidence, and Dr. Kline was chargeable with knowledge of the quantity and effect of the irradiation he caused to be administered to the appellant. (*Agnew v. Larson,* 82 Cal. App. 2d 176, 185 P. 2d 851.)

While counsel for the appellees made no objection to the testimony of Dr. Roys, they set forth in detail his testimony in a counter abstract to show he was not a physician but was testifying by virtue of an academic degree. Inferentially this may suggest Dr. Roys, not being a physician of the same school of practice as Dr. Kline.

was incompetent to establish negligence concerning medical practice and treatment. (*Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636.)

It is the customary practice, however, for a radiologist to have a physicist make his calculations where cobalt irradiation therapy treatments are given by a rotational beam to patients. This was confirmed not only by Dr. Kline but also by Dr. Hare. In fact, Dr. Kline testified that he did not know how to make the calculations necessary to make the irradiation administered meet the requirements for the radiation prescribed. He said he could not even understand the calculations when they had been made by others. It must be observed this is not unusual because the radiologist is not trained in nuclear physics, a specialty in itself. Dr. Roys was a technician of the same type as Darter, and, in fact, was the professor at Wichita University under whom Darter studied. Thus, there could be no legitimate objection to the competency of Dr. Roys to testify relative to the calculations made.

The appellees contend that no issue was raised in the pleadings or in the evidence at the trial, so far as the jury was concerned, which would exempt the hospital from liability for the acts of Dr. Kline under the doctrine of *respondeat superior* and that by reason thereof no instruction was required. The simple answer is that the appellees are privileged to make this admission, but the jury is entitled by an appropriate instruction to know about it. The appellees argue the appellant does not claim that Darter made any error in computation. While this is true, Darter did not, under the appellant's theory, make enough calculations to know that an excessive equilibrium dosage was administered five millimeters beneath the skin. Under these circumstances, the appellees' argument has no merit.

The appellant contends the trial court erred in failing to instruct that the jury might consider the fact of injury as evidence of negligence, citing *George v. Shannon*, 92 Kan. 801, 142 Pac. 967. On the facts presently before the court this point is not well taken. The appellant alleges injury as a result of burns from cobalt irradiation therapy. This is not a *res ipsa loquitur* case and no presumption of negligence of a physician is to be indulged from the fact of injury or adverse result of his treatment of the patient. (*Cummins v. Donley*, 173 Kan. 463, 249 P. 2d 695, and cases cited therein.)

In *Costa v. Regents of Univ. of California,* supra, it was contended, among other things, that necrosis did not ordinarily follow treatment from cancer X ray and that this circumstance amounted to proof of negligence. In rejecting the contention the California court said:

". . . The result of the same treatment is not always the same in all cases and on all patients. When the result of a treatment is less favorable or more prejudicial than in the great majority of cases such need not indicate that the treatment was negligently performed, but may as well be the result of individual differences in reaction or the less favorable circumstances of the case . . ." (p. 461.)

The expert testimony in the instant case confirms the correctness of the above statement. (But see, *King v. Ditto,* 142 Ore. 207, 19 P. 2d 1100.)

Upon the record presented it is apparent the appellees were united in interest; therefore, pursuant to G. S. 1949, 60-2907, the appellees were obligated in the exercise of their peremptory challenges in empaneling the jury to challenge jointly.

In conclusion we hold the trial court committed reversible error in the matter of instructing the jury. It has been held when the instructions to the jury define the issues and state the pertinent law with accuracy, the failure of the court to emphasize some particular point of law deemed important by a party litigant does not constitute error, especially when such party does not object to the instructions as given nor ask for a further instruction to supplement them. (*Kiser v. Skelly Oil Co.,* 136 Kan. 812, 18 P. 2d 181.) In the instant case the instructions given to the jury did not define the issues and state the pertinent law with accuracy, and further instructions were requested. By reason of the errors heretofore noted the appellant should be granted a new trial.

The judgment of the lower court is reversed with directions to grant a new trial.

PARKER, C. J., and PRICE, J., dissent.